894

SIMEON NIKULNIKOFF, Plaintiff, *v.* ARCHBISHOP AND CONSISTORY OF THE RUSSIAN ORTHODOX GREEK CATHOLIC CHURCH and Another, etc., Defendants.

Supreme Court, New York County, March 3, 1932.

*Borris M. Komar*, for the plaintiff.

*Jesse Perlmutter*, for the defendant.

HAMMER, J. The Russian Orthodox Greek Catholic Church has been beset externally by trials and internally with dissension since the first Russian revolution of March, 1917. Prior thereto the church, its institutions, clergy, religious workers and help received financial aid, and, in instances, their compensation, from the Russian government. About 1915, on account of the World War, this aid had stopped, but that was regarded as temporary, and it was expected financial assistance would shortly be resumed.

The plaintiff has for a number of years been a priest and member of the clergy of that church. In 1915 Evdokim Meschersky was archbishop of the Diocese of North America, Alaska and the Aleutian Islands. He went to Russia in 1918. Alexander Nemolovsky, who was bishop of Canada, and by many asserted to be vicar bishop and temporary head of the diocese, claimed election as archbishop by reason of a convention of certain of the clergy in America held in Cleveland, Ohio, and by later ukase of the Russian holy synod in 1920, and took possession of diocesan property and exercised

prerogatives of the office. His authority was recognized by some and denied by others. The latter asserted that Stephen Dzubay, bishop of Pittsburg, was substitute bishop or acting for and in the absence of Archbishop Evdokim by his appointment. In April, 1917, the most holy synod, generally recognized as the supreme governing body in the periods between the sobors or councils of the church, was reorganized and a call was issued for a sobor, which thereafter was organized and held. It was known as the sobor of 1917, and its acts were practically unanimously accepted. Among its principal acts were the revival of the office of the patriarchate, the vesting of supreme administrative authority in a sobor meeting periodically, composed of bishops, clergy and laymen, with the patriarch as executive head with first rank among bishops, but subject to the sobor, which he had the power to convoke, and between sobors the vesting of governing authority in two bodies, the sacred synod and the supreme ecclesiastical council. In February, 1923, there was summoned a second sobor, known as the sobor of 1923. Out of its deliberations and acts came the appointment of John S. Kedrovsky to the office of archbishop of the diocese, and with the title of metropolitan. Nemolovsky went to Russia in July, 1923, and prior thereto authorized Archbishop Platon Rojdesvensky to be administrator of the diocese. This was confirmed by Patriarch Tikhon in September, 1923. The authority and acts of the sobor of 1923 are still the subjects of bitter controversies and litigations. The clergy and laity are split asunder and are giving their support and allegiance to or are actively attacking and seeking to bring about the downfall of the leader in America on either the one side or the other. Those leaders are the archbishops and Metropolitans Kedrovsky and Rojdesvensky. In this State it has been decided that " the second sobor " was " in any event *de facto* valid, and Kedrovsky * * * the Archbishop appointed pursuant to its authority." And further, " Since the Patriarch had no power to appoint an archbishop, and since in any event an oral appointment would be invalid, this title (asserted by Rojdesvensky) does not seem to be well proven, nor is the claim of recognition by various persons who have no right of appointment any proof of authority to act as archbishop in this diocese, and thus to administer the trust in the real property herein involved. None of the bodies purporting to recognize him as an archbishop are shown to have had any authority to appoint an archbishop. The convention in Detroit of April, 1924, purported to secede from the Russian church and to make Rojdesvensky archbishop of an independent church. The letter of September 20, 1923, purporting to be signed by the Patriarch Tikhon, even if it be not spurious, does not pretend to

be an appointment of defendant as archbishop of North America, and even if it does, the Patriarch had no power to appoint archbishops, even if the office of Patriarch existed. The office, however, was abolished at the time of the date of alleged appointment. It is probable that the patriarch did not make a direct appointment because of lack of power." (*Kedrovsky* v. *Rojdesvensky*, 214 App. Div. 483, 487, 489; affd., 242 N. Y. 547.)

The plaintiff here does not recognize the authority of or give allegiance to Kedrovsky, but, on the contrary, to Rojdesvensky as archbishop and spiritual superior. His main witnesses in addition to himself were one of the defendants in the cited case and one of the minority trustees of the defendant corporation by order of this court. Both are adherents and supporters of Rojdesvensky, and like plaintiff do not recognize or give allegiance to Kedrovsky either as archbishop or as the president of the corporation. The court, solicitous of the protection of the entire membership in the real property of the church, required that minority representation be given to the Rojdesvensky party on the board of trustees of the defendant corporation, which, because it seemed best fitted, was authorized and directed to hold diocesan property for such purposes and also parish properties for the use of and until their ultimate disposition to the respective local parishes. The plan, which was consented to and apparently had the approval of the conflicting interests, contemplated the conservation for church purposes of the real property which by reason of such conflict and the resulting litigations was in danger of dissipation. It seemed, too, that thus keeping the property together for religious purposes might be of some cohesive force in stopping threatened disintegration of church membership so that when the clergy had settled their own differences and were again acting in unison many lay members would not have been so seriously disaffected as to be outside of church influence and organization. Under an order of this court made in the action of *Kedrovsky* v. *Archbishop & Consistory*, a receiver was appointed of the defendant corporation. He took possession of certain personal property as well as of certain real property. On November 25, 1926, the real property was surrendered to the corporation. Upon his accounting after the payment of the expenses of the receivership no personal property remained. It is clear then that although motives of parties are usually no concern of the court in legal actions, a direct assault in this action is directed against the diocesan property delivered to the trusteeship of the defendant corporation of which Archbishop Kedrovsky is president and his adherents the majority trustees, by the courts of the State in the *Kedrovsky* v. *Rojdesvensky* litigations. In testing the general

credibility of the claim and story of the plaintiff, consideration of the historic background against which the actors herein moved and the events happened would appear to be not only relevant to but of extreme importance in the determination of this controversy upon the merits.

The claim of the plaintiff is that on October 23, 1915, plaintiff entered into an agreement in writing with an unincorporated association, predecessor defendant corporation, and with the diocese of North America, etc., or mission, wherein it was mutually agreed that plaintiff should perform religious services for said association and said mission and they would jointly pay to plaintiff therefor a sum of ninety dollars per month and, in addition thereto, provide free living quarters. The alleged agreement, translated into English, is as follows:

"ARCHBISHOP OF NORTH AMERICA
" 15 East Ninety-seventh Street

" Kindest Father SIMEON: I am asking your superiors to have you with me, in America. Please come. Here is really not as bad, as said. You will receive free quarters and a salary of not less than 180 rubles per month.

" In the beginning of July, Archimandrite Philip, the Rector of the New York Seminary is journeying to us. Journey with him through Archangel. The journey is absolutely dangerless.

" The second class ticket with meals costs, all told, only 100 rubles.

" The government now does not advance money. We will get later, I hope.

" Greetings to acquaintances.

" 10 /23, year 1915."      "ARCHBISHOP EVDOKIM.

On trial the above date was shown to be June 23, 1915. Plaintiff further claims that on August 16, 1915, said agreement was modified and it was agreed that in addition to said religious services he would become head of their religious vestment shop and be paid *on demand*, in addition to said salary and free living quarters, further sums as commissions upon each garment made in said shop in accordance with the written scale approved by plaintiff and the association. The claim is also made that on May 14, 1917, the defendant corporation was organized and adopted, approved and assumed the modified agreement with plaintiff, that payments were made on account to plaintiff and he duly performed on his part. The amount of this claim is $13,196.50 salary and $4,162 for vestments, a total of $17,558.50 and interest.

For a second cause of action plaintiff claims that he loaned the defendant $4,650, which upon the trial was amended to $5,150;

that defendant acknowledged the indebtedness and promised to pay same to plaintiff, but no part was paid, although demanded. The sum total claimed is $22,508.50 and interest.

Plaintiff's claim, then, as it appears in his complaint and bill of particulars, is based upon the above-mentioned written contract, and the oral modification of same. The letter of June 10, 1923, however, which plaintiff asserts contains the mutual agreement of the parties, reading only its context, appears to be lacking in the essentials of a contract. The parties are mentioned indefinitely, as Father Simeon and Archbishop Evdokim. Even though the latter may be identified by the heading "Archbishop of North America, 15 East Ninety-seventh Street," no identification of the former is given. The subject-matter, claimed by plaintiff to be the performance of religious services, if any is stated, must be constructed out of the very g neral expressions used, *i. e.*, the titles of the parties, the reference to " your superiors," "Archimandrite Philip, the Rector of the New York Seminary," and " the government now does not advance money." From these, which as readily indicate an instructor at the seminary or any one of a number of other possible suggested occupations, we are asked to conclude that religious services in the special field of missionary priest attached to the archbishop or diocesan authority for work in poor parishes was the subject-matter expressed. The consideration is not even definitely stated. " Free quarters and a salary of *not less* than 180 rubles per month " is hardly the legal consideration which under rule is essential to produce a legal, binding result in a written contract. The paper will be examined in vain for any statement therein from which arises mutuality of agreement and mutuality of obligation. At best it appears to be a proposal, offer or invitation to the indefinite Father Simeon to come to America and be with Archbishop Evdokim. The subject-matter and compensation or consideration are left to the future. From the paper alone the subject-matter might be religious services, or anything else, even vestment making, which plaintiff asserts was the subject-matter of a modification. The writer of the invitation did not state that he personally would pay the compensation nor did he indicate by whom or from what it would be paid. Indeed, it might well be said that the statement, " The government now does not advance money. We will get later, I hope," indicates the compensation was to be paid out of government money if and when received. While a contract consists not only of the agreements which the parties have expressed in words, but also of the obligations that are reasonably implied as concomitants, the difficulty here is that if any agreements are intended to be expressed

the language used is so vague and indefinite as not to manifest just what is the obligation of the mentioned parties each to the other, and the right, if any, each acquires in or to whatever may be intended as his obligation and agreement by the other. It may well be said that the transactions shown by the evidence are not strictly speaking within the alleged terms of the contract pleaded. The litigations in respect of this church and members of its clergy have, however, been in this court for upwards of fourteen years and in their ramifications involve the interests, material and spiritual, of many thousands of people and property of the value of several million dollars, and full consideration of the actual issues sought to be presented, even though inarticulately stated, seems to be bringing, and it is hoped will bring, finality to matters presented for secular determination which, by the exercise of greater Christian forbearance, might better have been adjusted within the precincts and under the authority of the church itself.

The plaintiff alleged and gave evidence to show that he duly entered upon the performance of religious services for the association and mission and duly performed same. His evidence on the subject was to the effect that at Archbishop Evdokim's request he remained at the cathedral and assisted at public services there, and at the Russian National Home of St. Vladimir, went to the seminary as confessor, and also went to and acted at St. John the Baptist Church at Spring Valley as missionary priest. Plaintiff admitted that for many of these services he received what he termed small expense money from the local churches, to cover car fare and incidentals, but which without definite explanation he stated was not spent but added to his cash accumulations, to which herein reference is later made.

We will assume, to get beyond dismissal, for the reasons already given, sufficient definiteness and certainty in the letter of June 23, 1915, to constitute it a communication of an offer or proposal to enter into a contract upon the terms claimed by plaintiff. The offer then would be the promise to pay for the act of performing the religious services contemplated. Usually if an alleged agreement is uncertain, it is because the offer was uncertain or ambiguous, for the acceptance must be identical with the offer or there is no meeting of the minds and no agreement. If either side proposes a change to make the agreement certain, there is a new offer and acceptance and a different agreement. So in the alleged agreement here, a change to ninety dollars per month instead of the indefinite " not less than 180 rubles per month " would constitute a new offer. A contract of employment which does not specify its duration, the services to be rendered or position to be filled, and the definite

compensation to be paid, is void for uncertainty although·it may afford a remedy at law to the party who has wholly or partially performed. It would seem that the plaintiff, although in his complaint and bill of particulars he stated that the letter of June 23, 1915, is the written contract, is really not relying upon that alone but in effect asserting there was a contract arising out of the letter, a practical construction given by subsequent acts of the parties, and alleged performance. Consideration may perhaps be given to such acts and the usual tests and principles of construction applied for the purpose of ascertaining and if possible enforcing the intention of the parties. *Id certum est quod certum reddi potest.* Can it be determined what religious services the plaintiff was by the alleged agreement required to perform? If mere indication in the writing that religious services are to be performed, aided by such practical construction, signifies what is the obligation imposed, even though it does not clearly appear to those not informed as are the contracting parties, the agreement may be saved from being void because of the indefiniteness of subject-matter. Consideration will be given then to what is understood by the expression " religious services " as rendered by a priest or clergyman.

Secular dictionaries define the word " priest " as follows: Oxford (1909): " One whose office is to perform public religious functions; an official minister of religious worship. In hierarchical Christian churches: a clergyman in the second of the holy orders (above a deacon and below a bishop), having authority to administer the sacraments and pronounce absolution. In more general sense: a clergyman, a member of the clerical profession, a minister of religion. A sacrificing priest, a minister of the altar. In specific Christian use, the officiant at the Eucharist and other sacredotal offices."

New Standard Dictionary (1928): " One especially consecrated to the service of a divinity and considered as the medium through whom worship, prayer, sacrifice, or other service is to be offered to the being worshiped, and pardon, blessing, deliverance, etc., obtained by the worshiper. * * * A member of·the second order of the sacerdotal ministry, having authority to administer the sacraments (excepting holy orders and, as a rule, confirmation) but depending for jurisdiction on episcopal authority."

The Oxford Dictionary (1909) defines " service " as follows: " In religious uses the serving (God) by obedience, piety and good works. Worship; especially public worship according to form and order. A celebration of public worship. A ritual or series of words or ceremonies prescribed for public worship, or for some particular occasion or administration. Often with defining word, as baptismal, burial, communion, marriage service (none of these

are so entitled in the Prayer book). A musical setting of those portions of the church offices which are sung; especially the music for the canticles at morning and evening prayer."

The New Standard Dictionary (1928) defines the word " service " as follows: " In religion: That devotion of heart and life which is due to God; obedience to the divine commands; as, ' piety is a blessed service.' The public exercise of worship according to the methods or form prescribed by an ecclesiastical organization; as ' There will be services in this church on Sunday next.' A liturgical form for worship, especially a form prescribed for a special occasion or object; an office; as, a marriage service, the burial service. Those portions of a liturgical office, collectively, which have musical settings, or the musical settings belonging to one office; the chants, canticles, etc., of a liturgical office."

In 34 Cyc. (p. 1110) " religion " is described as: "A term said to refer to one's views of his obligations to his Creator and to the obligations they impose of reverence for his being and character and of obedience to His will; morality with a sanction drawn from a future state of rewards and punishments; some system of faith and practice resting on the idea of the existence of one God, the creator and ruler, to whom his creatures owe obedience and love. Any system of faith and worship."

The word is similarly defined in Webster's, the New Standard Dictionary and the Oxford Dictionary.

Religion as generally accepted may be defined as a bond uniting man to God and a virtue whose purpose is to render God the worship due to Him as the source of all being and the principle of all government of things. Religious services of a clergyman may be said to require him under superior authority to offer prayers and sacrifices, to teach, preach and give counsel, and to perform services and acts in accordance with the beliefs, principles, doctrines, canons, rules and regulations of his religious organization, designed to bring the members thereof, who are within the sphere of his ministrations, to cherish habitually toward God sentiments of adoration, praise, thanksgiving, loyalty and love, and to give expression thereof by outward acts similarly prescribed. There is also about such services the idea of a tendency to self-perfection, the ascetic and the mystical, and that the object sought is to bring about the realization that perfection finds its motives in God and the opportunity for its exercise in one's neighbor and that the duty entailed is to lead others to salvation and holiness and to remind them of such destiny and of the means of fulfilling it. The priest or clergyman of course may be virile and human. Experience demonstrates that usually they are. Such qualities make for leadership and arouse

and inspire greater respect in followers. The thought seems to be, however, that the vocation requires the clergyman to refrain from and be above the base materialism and the sordid so often involved in personal money making in competitive worldly business. The position is regarded as a highly favored one, paid principally by the sacrifices entailed and the benefits derived by others from the teaching and example.

Were it permitted to go outside of the alleged contract and beyond the generally accepted ideas of what constitutes religious services of a priest, the only information furnished is that contained in defendant's by-laws (Art. IV, § 2, subd. 5), which reads: " The rights and duties of the parochial clergy are defined by the church rules and special instructions, in the basis of the following fundamental rules: a. The head of the clergy is the priest. The other members are his chief helpers in all his work, who owe him respect and obedience, as he owes to them fatherly attention and care. b. The priest of the parish is the pastor of the parishioners; he is intrusted by the Bishop with the duties of teaching them the rules of faith and Christian living, of celebrating public Divine Service and private offices, according to the church canon, of administering holy Sacraments and guiding the Christian life. He is responsible before God and the Bishop for the prosperity of his flock as regards religious feeling, spiritual enlightment and moral progress. c. Besides the duties of pastorship and Divine offices in the carrying out of which the priest is guided by his presbyterial oath and his conscience and which is controlled by the Diocesan Authority the intermediary of the Rural Dean it is the duty of the parochial priest and the other members of the clergy, his helpers, to look after the good order of the church and its adornment, to found a church library, a parish school, a reading room, a temperance society, and to participate actively in all the works of the Parish Council and the support of the central institutions of the Diocese."

Assuming that it can be said that the performance of religious services was the subject-matter of the offer, aided by the foregoing it may be said that generally the intention of the parties upon the services to be performed has been ascertained. There does not appear to be any expression of a correlative obligation on the part of the plaintiff to perform such services. Assuming that by the rules and regulations of his religion and the usages customarily incident to his calling it may be implied that plaintiff in conscience was obligated under the circumstances to render such religious services as directed by Archbishop Evdokim, it nowhere appears by writing, verbally or by formal resolution, that plaintiff was under the obligation of performance to the unincorporated association,

the diocese or mission as such or for the defendant corporation, and as to them it was wholly lacking in mutuality. It nowhere appears that the defendant or its alleged predecessor association or mission, or even Archbishop Evdokim, was bound to accept and pay for defendant's services for any definite period. Mutuality is lacking where the agreement is terminable at any time at the will of one party alone, and also where one party is bound to perform services indefinitely but the other is not bound to accept and pay therefor.

It is alleged by the plaintiff, no doubt to show that the unincorporated association, and the diocese or mission, were in effect one and the same entity, and that the corporation defendant was successor to the property, assets and rights, as well as liabilities, including that claimed to be owed plaintiff, that the archbishop, or the bishop performing his duties, was *ex officio* president of said corporation, of the association, and of the mission. The evidence is to the contrary. The diocese, also known as the mission, it being a foreign mission of the parent Russian church, appears to have a two-fold application, *i. e.*, the territory included therein, and the religious and clerical organization, as well as the lay membership, in such territory. For the administration of the diocese, the church is ruled by the archbishop (or his substitute), appointed by the Russian holy synod in Russia. The archbishop rules through the North American Ecclesiastical Consistory, the members of which are his council, and constitute the board of trustees, at least three being appointed by the holy synod. There are dependent upon the archbishop, three bishops of districts, one of Canada, the second of Alaska, and the third of Pittsburg. The diocese is also, for the administration of parish churches, divided into districts, at the head of each of which is an ecclesiastical superintendent and his council. In these districts are the parishes under the immediate supervision and government of the rector or priest and his parish council. It has not been shown that this administrative organization as such has been incorporated. The diocese or mission has not been shown, and does not appear, to be a legal entity or to have recognized legal existence. It cannot sue or be sued in civil courts. Such property as it controlled was held by trustees. As pointed out above, such property was given over to the trusteeship of the defendant corporation as conservator pending the final disposition of same. Whatever purpose there was for the incorporation, and all the offered evidence on the subject is herein reviewed, the defendant corporation never owned or held diocesan real property. The fact is that these real properties have been the subject-matter of an action in this court, begun in October, 1918, by Kedrovsky in which the

corporation was a party defendant. In that action (*Kedrovsky* v. *Russian Catholic Church*, 249 N. Y. 75) the Court of Appeals decided on July 19, 1928, " the corporation * * * did not hold the legal title to the lands in controversy. It did not succeed to any title belonging to the unincorporated association * * * for the reason that the association had no title to succeed to." Under the Religious Corporations Law of New York the defendant was incorporated on May 14, 1917. On August 15, 1917, under the Corporations Law of Pennsylvania, a second corporation was organized with a similar name. If the purpose of incorporation was to make the diocesan administration a corporate entity, the situation with two such corporations is as anomolous as that which exists by reason of the conflicting claims of the two archbishops. Nowhere in the resolution under which defendant was incorporated, the certificate of incorporation or the by-laws does it appear that the corporation was empowered to furnish priests or the religious services of clergymen to the diocese or to the parish churches. The authority and responsibility to do this, in so far as the evidence shows, rested and still rests solely and alone with the archbishop. It appears from the foregoing that responsibility, if any there is, under the alleged agreement was that personally and individually of Archbishop Evdokim.

Nowhere does it appear that the alleged contract for the performance of religious services was ever adopted or assumed by the defendant corporation. No formal resolution in respect of same was offered in evidence. No course of conduct was shown from which adoption of contract or assumption of liability may be implied.

Even if it could be held generally that said archbishop was the agent of the unincorporated association and the diocese or mission the defendant corporation could not be held liable. Assuming that definitely each month a specific amount (plaintiff claims ninety dollars, although the writing states not less than 180 rubles) became due and payable for the services rendered, for each such definite amount an action accrued. Taking only part payment each month did not change the terms of the contract or the rights of the parties under the rules of law applicable. Upon non-payment the plaintiff became entitled to interest on the amounts unpaid. The so-called oral agreement, if there was one, that the unpaid amounts would remain " on deposit " with the archbishop or the association, subject to demand therefor by plaintiff, and that interest would be paid thereon did not change the rights or status of the parties, nor did it require that other or different rules of law would be applicable. If it can be given any consideration, it must be regarded only as

the expression of the parties of that which constituted the rights of the employee and the liability of the employer upon non-payment of the full amounts payable under the written agreement. These rights and obligations, in the event of breach, were in law identically the same as the verbal declarations of the parties, and being definite and readily ascertainable for each party, there could be and was no consideration for the claimed modification in respect of the alleged requirement of " demand." The claim is that amounts on account of the agreed salary were paid monthly up to June, 1918. Between that date and October, 1922, no salary was paid. The alleged written agreement was one terminable at will. Even assuming it was the agreement of the corporation, the only fair inference to be drawn from non-payment of any compensation would seem to be that in so far as the corporation was concerned the agreement was ended. The correctness of this view is emphasized by recalling what was well known to plaintiff and his witnesses and to all the members of the church that the second sobor was to be summoned in 1921 under resolution of the sobor of 1917 and from that time on the church was in a state of turmoil. Between 1917 and 1923 political difficulties in Russia had their counterpart in the church. Parties were being formed and adherents maneuvering. In America Nemolovsky first and then Rojdesvensky was a storm center. Litigations started in 1918 by Kedrovsky were being pressed. The church in America was poor and no State aid could be expected. There is evidence that plaintiff was pastor or priest of St. John the Baptist's Church at Spring Valley, N. Y. The official church organs, which were in charge of his friends, so listed him in 1918. The second sobor was called in 1923. The defendant corporation was organized in 1917 under section 15 of the Religious Corporations Law. At that time that statute provided: " The trustees of every incorporated governing body and their successors shall hold their offices during the pleasure of such body, which may remove them and fill vacancies in accordance with its rules and regulations. Such corporation may take, administer and dispose of property for the benefit of such governing body, or of any parish, congregation, society, church, mission, religious, benevolent, charitable or educational institution existing or acting under it."

Defendant's certificate confers upon it the following powers: " * * * That the corporation have the power to take by gift, will and devise such amount, sum or sums, parcel or parcels of real estate as may from time to time be conveyed or willed or devised to the Russian Orthodox Greek Catholic Church, and

" * * * that the Board of Trustees shall consist of six members including His Grace, Rev. Evdokim Meschersky, and shall have

power to adopt, amend, and enforce proper by-laws * * * and shall have full charge of the management and affairs of the corporation, and further

"* * * that the trustees of such corporation shall have the power to invest any surplus money of the corporation in excess of the amount needed for the running expenses in real estate and in such other securities as savings banks of the State of New York are allowed to invest their funds in, and further,

"* * * that the corporation shall have the power to hold real estate in the name of the corporation, * * *."

Defendant's by-laws in so far as they may have any relevancy to the issues, provide: "Article IV, Section Two, subdivision 4. The permission of a monthly salary of the clergy, their dwellings, the supply of fuel, lighting, telephone and water, as also the fees of the priest for offices, in accordance with the existing normal statutes, being the obligation of the parish and an object of solicitude on the part of the Diocesan Authority, shall be settled at the first establishment of the parish, and can be changed only with the knowledge and by permission of the Diocesan Authority.

" Article IV. Section Four, subdivision 2. As to the financial liabilities of parishioners towards their parish, church and parochial institutions, they are defined on one side by their obligations before the Head of the Diocese and on the other by the resolution of their Parochial Council which agrees with the Head of the Diocese.

" Article IV, Section Six, subdivision 9. The following objects may be discussed by the parochial meeting: * * * (f) the discussion of the support the parishioners are to give to the church in its various needs, by means of special collections and voluntary donations among the members. * * * (k) finding means necessary for * * * participation in the support of the Central Missionary Institutions (seminary, primary ecclesiastical schools, girls' college, orphanage, poor house, ' cathedratik,' etc.)

" Article I. Name and Membership. Section One. The Church shall be known hereafter as The Russian Orthodox Greek Catholic Church of North America.

" Section Two. It shall be maintained for and by all Christians confessing the Orthodox Faith according to the Eastern rites.

" Article II. Object. Section One. The object of the Church is to establish religious and moral life of Orthodox Christians on the foundation of the Holy Scriptures and the Holy Apostles, Oecumenical Council and Old Eastern Council, rules of the Holy Fathers and the laws of the Eastern Church.

" Article III. Organization. Section One. The Russian Orthodox Greek Catholic Church in North America will be ruled by the

Archbishop (or his substitute) appointed by the Russian Holy Synod in Russia.

" Section Two. The Archbishop rules through the North American Ecclesiastical Consistory which is located at the Cathedral in New York City, the members of which are his council and constitute the Board of Trustees."

After incorporation, in so far as the record shows, there was no meeting of the corporation or its trustees until September, 1922. It has not been shown that plaintiff or his alleged contract was the subject of a resolution or even discussed at any meeting.

The alleged oral modification of agreement by which plaintiff was to become head of the religious vestment shop I find to be no modification but a separate and entirely different agreement. It was oral. Payment under this agreement was due as the services were rendered. The agreement alleged is that in addition to said religious services, plaintiff *should also become the head of their religious vestment shop*, and should be paid *on demand* in addition to the salary and free living quarters further sums upon each garment made in said shop in accordance with the written scale approved by plaintiff and the association. This was not the agreement shown even by the testimony of plaintiff. The work under this agreement as shown by plaintiff is so incongruous with the alleged services to be performed under the first agreement that it is well to consider the nature of such work.

Christian vestments have developed from the secular dress of the Greco-Roman world, influenced to some extent by the recollection of the use of ceremonial attire by the Mosaic cult and the consequent historical appropriateness of liturgical garments for church services. Although intimately connected by their entire history to such services, particularly the mass, being only externals, the vestments are not in themselves essential. Although through custom, use and development vestments acquired a typical and moral symbolism, the former as expounding the founder of the religion, and the latter the official and priestly virtues of the wearer, vestments were always regarded as articles of dress. Type and character were prescribed by liturgy, and particular articles limited to use in specific ceremonies and special occasions, but they were always the product of the science, skill and labor of persons adept in manufacturing cloth and other materials into wearing apparel and articles of personal adornment, e. g., embroiderers, lace makers, needle workers and tailors. The work, it appears, has become a specialty and the specialist, according to his particular branch known as a clerical tailor or vestment maker. It does not require much reflection upon the number of the clergy in the various

Christian religions and sects, who are supplied with clerical garb, garments, clothing and vestments, to come to the realization that the manufacture and sale is a vast competitive business industry.

Plaintiff's evidence established that he was supplied with materials which he made into vestments. These were delivered to and sold in the shop for the sale of vestments and religious articles conducted in the basement of the Russian Orthodox Greek Catholic Cathedral. After performing the labor of manufacture, upon delivery of the vestments, plaintiff's evidence shows and his memorandum states " he had nothing further to do with said garments, was never in charge of the sale thereof, nor of their custody." Plaintiff's evidence shows that such *vestments were made by him up to March, 1919, but none thereafter,* and that upon the agreed scale the total sum of $4,162 was due. The books and records of the prior regime are not in the possession of Archbishop Kedrovsky. Plaintiff alone knows of payment and he solely gave the proof of non-payment. The complaint alleges " there is now due and owing plaintiff on account of said commissions upon religious vestments made in said shop *the sum of $4,162, with interest* thereon from the 12th day of April, 1922; " this date is that of demand in writing. The agreement was for the performance of labor and upon such performance the agreed amount became and was due. Upon the making and delivery of each piece or article of vestments plaintiff became entitled under the terms of the agreement to payment of the specific amount designated therefor in the agreed scale. The right to payment then existed and was forthwith enforcible by action. Upon non-payment he was entitled to interest. Demand, even though that word was used in the agreement, was not necessary to entitle plaintiff to maintain an action to enforce the right of payment. This action was not commenced until September, 1927. Defendant has pleaded the Statute of Limitations as a defense. It is a bar to recovery under either or both agreements, as well as under the alleged written agreement as modified by the alleged oral agreement.

The second cause of action is for money loaned. There is no evidence that it was borrowed by any officer as such either of the unincorporated association or of the defendant corporation, or that it was borrowed by authorization of the by-laws, or resolution of trustees. No course of dealing has been shown by which the association or corporation held out the borrower as authorized to borrow for it and thus be estopped from questioning the borrower's authority.

It has not been shown by any competent evidence that there was on the part of the association or corporation either the accept-

ance or receipt of the money borrowed or any part of it or any ratification by the acceptance and retention of any benefit or advantage from the act of the borrower which would render the defendant liable.

The plaintiff placed himself in a dilemma when upon cross-examination he testified to the sources of the money claimed to have been loaned. It appeared that the money received on account cf services was greatly insufficient to enable him to loan the amounts claimed. His explanation was to the following effect: Upon arrival in America he had $1,000 in cash. When he went to churches as missionary he was reimbursed for traveling and incidental expenses. These amounts he saved. He manufactured and sold vestments on his own account and made and saved money. All these amounts he accumulated in cash and kept in his residence. With this cash he made the alleged loans.

Either the explanation is incredible or we find this priest accepting as reimbursement for expenses excess amounts under such practice as enabled him to save money, and although under claimed contract to render religious services exclusively, except in such part of his spare time as he could make religious vestments to be sold at the cathedral shop, carrying on a profitable business on his own account, manufacturing and selling religious vestments.

Plaintiff by his testimony has shown not only as priest and clergyman did he not recognize the authority or give his loyalty to Archbishop Kedrovsky, although accepting him as head of the corporation for the purpose of getting money out of it for the alleged services but as employee, by engaging in the vestment business without any shown permission in competition with his employer, he was disloyal to his employer to whom he owed the utmost of support and good faith.

The trial has been before the court without a jury, but as if a jury were present. Each side moved for a direction of a verdict.

For the reasons expressed and upon the merits as same were shown by the evidence in the case, all of which has been duly considered and outstanding parts of which have been referred to above, a verdict is directed for the defendant upon its motion. Plaintiff's motion is denied. Plaintiff may have exception; thirty days' stay of execution, and sixty days to make a case.