HILDA KAY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102405. Promulgated September 12, 1941.

*Mark Eisner, Esq.*, for the petitioner.
*F. S. Gettle, Esq.*, for the respondent.

100

OPINION.

KERN: The first issue to be considered is whether the $28,281.25 received by petitioner during the taxable year is taxable income. Respondent asserts that a contract existed between Kleinschmidt and petitioner, and that any amounts received by reason thereof, whether in performance of the contract, by judgment of court, or by way of settlement, constitute income within the meaning of section 22 (a) of the Revenue Act of 1934. Petitioner, on the other hand, argues that a contract never existed between herself and Kleinschmidt; that Kleinschmidt's offer was clearly to make a gift, and therefore, any stock or money received by her pursuant to his gratuitous promise was nontaxable. Consequently, our initial inquiry must be whether or not the negotiations between petitioner and Kleinschmidt constituted a contract.

It is frequently a matter of the greatest difficulty to clearly ascertain the dividing point between promises creating legal obligations and mere gratuitous agreements. As the courts have often said, each case depends so much on its own peculiar facts and circumstances that it is of little aid in determining later cases with differing facts. The promise or agreement, the relation of the parties, benefits to the promisor, detriment to the promisee, the circumstances surrounding the promise, and the intent of the parties as it may be deduced from all the facts in evidence, play important parts in the inquiry. If it can be ascertained that the sole purpose was to confer a benefit on the promisee merely from affection or generosity, the agreement is clearly gratuitous. But if the purpose is to obtain a *quid pro quo*, the promise is not gratuitous and becomes in time a legal obligation. *Walton Water Co.* v. *Village of Walton*, 238 N. Y. 46; 143 N. E. 786; *Nikulnikoff* v. *Archbishop*, 142 Misc. 894; 255 N. Y. S. 653.

Upon an examination of the facts in our instant case, we note that Kleinschmidt did not attempt to induce petitioner to come to Highland Park through any pity for her, nor can we conclude that it was merely affection or generosity which motivated his offer. His wife had just died and he needed someone to fill her place in the running of his household. If she came to Highland Park and assumed this role, it would clearly be beneficial to Kleinschmidt. The fact that she was gainfully employed in New York, receiving $5,400 a year, and had good chances for advancement meant that she would have to forego this lucrative career if she accepted Kleinschmidt's offer. This she ultimately determined to do. The intent of the parties is perhaps a trifle difficult to ascertain. Frequently Kleinschmidt spoke of the stock as a gift to petitioner and he even asked petitioner's assistance in devising a plan to avoid payment of a gift tax. In his letter of January 9, 1933, he said that "there will be no strings to the transaction whatsoever"; and in his letter of January 19, 1933, he said: "So far as I can see we need nothing in writing. I want to give you the shares so that you will have sufficient income to be independent * * *." But in the January 9 letter he said: "I want to give you this stock * * * so that you will not have the feeling that you are being paid to take care of us." We interpret this to mean: "Actually you are being paid to take care of us but I don't want you to be constantly reminded of this fact by receiving monthly amounts from me, or the like."

In the April 2, 1934, letter, written when Kleinschmidt had determined that the set-up was not working well, he did not mention the stock at all, although he had never turned it over to petitioner. He merely said: "As regards the financial situation I will give you an amount that will take care of your expences [*sic*] until you can

find a position again." It would seem that Kleinschmidt felt that petitioner's services did not merit the stock, even though he had told her in an earlier letter that, if for any reason the arrangement did not work out and petitioner decided to go on her own again after a few years, it would be entirely up to her as to whether the shares should be returned to him.

When petitioner verified her complaint in May 1934, she swore that her relationship with Kleinschmidt had been a contractual one and that, pursuant to the agreement between herself and her uncle, he was obligated to turn over the 300 shares of stock to her. Kleinschmidt formally denied that any contractual agreement had ever been entered into, but subsequently, and apparently under advice of counsel, he agreed to and did settle the dispute by payment of 250 shares of stock and $2,000 in cash to petitioner. While petitioner's position at that time does not estop her now from asserting otherwise, it is strongly indicative of her conception of the purpose, intent, and effect of Kleinschmidt's promise.

Upon all the facts in the case we are impelled to call the relationship between petitioner and Kleinschmidt a contractual one. Benefit to the promisor was anticipated and detriment to the promisee was inevitable. Under these circumstances it is a fair conclusion that a unilateral contract existed. Williston on Contracts, Rev. Ed. vol. 1, p. 380; *Allegheny College* v. *National Chautauqua Bank*, 246 N. Y. 369; 159 N. E. 173. Petitioner had a legal claim against her uncle for services rendered pursuant to this agreement. The fact that the amount petitioner eventually received resulted from a settlement of her suit can not alter the fact that, basically, the payment was a mere substitute for compensation under the agreement. *Hort* v. *Commissioner*, 313 U. S. 28. In the *Hort* case, the Supreme Court said:

That the amount petitioner received resulted from negotiations ending in cancellation of the lease rather than from a suit to enforce it cannot alter the fact that basically the payment was merely a substitute for the rent reserved in the lease.

Applying this theory in the present case, we see that, regardless of whether petitioner had prosecuted her suit to recovery or accepted, as she did, stock and money in settlement, the payment was merely a substitute for the payment provided in the agreement. This being the case, the total amount received is ordinary gross income, and taxable as such.

We can see no merit in petitioner's contention that there was a symbolic delivery of the stock to her in 1933 by virtue of Kleinschmidt's payment to her of an amount equal to the amount of the dividends due thereon April 15, 1933. In the first place, this contention is based on the premise that Kleinschmidt had an intention to

make a gift of the stock, with which, as we have shown above, we can not agree. In the second place, even if he had an intention to make a gift, there is nothing in the stipulated facts to show that there was an intention to make a present gift rather than a gift *in futuro*.

The remaining issue concerns the 25 percent penalty provided by section 291 of the Revenue Act of 1934 for failure to file a return. Having determined that the deficiency exists, the penalty is mandatory. *Douglas L. Edmonds, Administrator*, 31 B. T. A. 962; affd., 90 Fed. (2d) 14; certiorari denied, 302 U. S. 713.

*Decision will be entered for the respondent.*