MISSOURI CHURCH OF SCIENTOLO-
GY, Plaintiff-Appellant,

v.

STATE TAX COMMISSION of Missouri,
J. E. Riney, Don G. Williams, Robert F.
Love, Commissioners of State Tax Com-
mission of Missouri, John K. Travers,
Collector of Revenue, City of St. Louis,
and Glenn J. McBrady, Assessor, City of
St. Louis, Defendants-Respondents.

No. 59551.

Supreme Court of Missouri,
En Banc.

Dec. 19, 1977.

Rehearing Denied Feb. 8, 1978.

Alan C. Kohn, Thomas J. Frawley, St. Louis, for plaintiff-appellant.

James J. Wilson, Associate City Counselor, St. Louis, for defendants-respondents.

RENDLEN, Judge.

This proceeding arose with the addition of appellant's tangible personal property to the tax rolls for the year 1974 by the St. Louis City Assessor. Obtaining no relief by successive appeals to the Board of Equalization and the State Tax Commission, appellant sought judicial review claiming exemption from ad valorem taxation under Mo. Const. Art. X, § 6, and § 137.100,[1] on the ground its property was "used exclusively for religious worship".[2] No challenge is made to the assessed valuation of appellant's property but only to the denial of the claimed exemption.

■ Generally the scope of judicial review for administrative agency decisions is limited to a determination of whether the order is supported by "competent and substantial evidence upon the whole record" as provided in § 536.140–2(3). However, this case does not involve the exercise by the agency of administrative discretion in the light of the facts under § 536.140–2, but only the application by the agency of the law to the facts, accordingly the court may weigh the evidence for itself giving due

---

1. All statutory references are to RSMo 1969.

2. Mo.Const. Art. X, § 6 provides in pertinent part: "[A]ll property, real and personal, . . . not held for private or corporate profit and *used exclusively for religious worship*, . . . may be exempted from taxation by general law." (Emphasis ours.) Pursuant to this authority, the legislature by § 137.100(5), RSMo 1969 exempted from state, county and local taxation, "All property, real and personal, actually and regularly *used exclusively for religious worship*, for schools and colleges, or for purposes purely charitable and not held for private or corporate profit, . . ." (Emphasis ours.)

weight to the opportunity of the agency to observe the witnesses and to the expertise and experience of the Commission, § 536.-140–3. It is by this standard we examine appellant's contentions of error.

 In the hearing before the Commission twenty-two proposed exhibits had been marked and identified during testimony of the appellant's sole witness though they were neither offered nor accepted as evidence by the Commission.[3] Urging their consideration by this court, appellant cites *Hilke v. Firemen's Retirement System of St. Louis*, 441 S.W.2d 730, 733 (Mo.App. 1969) as authority for such consideration, however, we perceive factual differences distinguishing *Hilke* from the case at bar. There, in a claim for disability benefits, certain medical reports had not been properly offered before the Firemen's Retirement System Board. On appeal the court stated: "Although the record does not show the reports were offered in evidence in ritualistic language, we hold that the method of putting them before the Board for its consideration fully met the less formal procedural requirements of an administrative hearing." [l.c. 733] The items so considered, despite lack of formal offer, were medical reports prepared pursuant to the provisions of § 87.160.2, for the express purpose of informing the Board of the facts and the conclusions and recommendations of the medical examiners. It is clear the statute requiring the examining physicians

to "report in writing to the board," contemplated that the reports be available to assist the Board in its deliberation and equally important the Board and the parties intended the use of those reports as evidence.[4] Those facts, not present here, were determinative of the issue. Though counsel for the Tax Commission stated to the trial court and to this court in oral argument he would not have objected to the introduction of the exhibits had they been offered, the fact remains they were not and no stipulation waiving objection to their consideration has been presented. The Commission had before it no offer of evidence nor objections thereto on which to rule, neither was the Commission apprised of counsel's later announced attitude on the matter. Although technical rules of evidence are not controlling in administrative hearings, fundamental rules of evidence are applicable. *State ex rel. Bond v. Simmons*, 299 S.W.2d 540 (Mo.App.1957). Consistent with these holdings, § 536.070 provides in subsection 2 that "each party" in an administrative hearing "shall have the right . . . to *introduce exhibits*." (Emphasis ours.) No mention is made of other procedures for admission of exhibits as a part of the record in such proceedings except *subsection 5* which provides that "Records and documents of the agency [which also must be offered in evidence] . . . may be considered as a part of the record *by reference thereto* when so offered," (Emphasis ours).

---

3. These exhibits consist, among others, of the appellant's Articles of Incorporation and amendments thereto, bylaws, letters of commendation for charitable work done, a bound volume entitled "The Background and Ceremonies of the Church of Scientology of California, Worldwide" which appellant's witness, Rev. Rock, identified as "the ceremonies book that we use at Sunday services and we use this as a standard format for our other ceremonies: weddings, christenings, funerals. And it is also background information which relate to philosophical roots of the church to other religions, Buddhism, Hinduism and early Christianity." Another book entitled "Scientology: A World Religion Emerges in the Space Age" was described as a recently published work containing background information concerning the philosophy and ceremonies of the "Church of Scientology".

4. The court in *Hilke* at 733 states: "Early in the hearing plaintiff's counsel referred to plaintiff's injury report lodged in one of the Board's two files and said, '*I imagine it is part of this official document that we have introduced in evidence here.*' *Defendant's counsel agreed* and thereupon the Board's files were marked as Exhibits 1 and 2. Later, plaintiff's counsel formally offered other documents in evidence, but in speaking of documents already in Exhibits 1 and 2 he referred to them as '*part of the file.*' Near the end of the Board hearing, defendant's counsel wished to introduce City Ordinance 50707 as Exhibit 3; he stated he wanted the record to show that the ordinance was introduced as an exhibit 'with the others.' . . . ." (Emphasis ours.)

No provision is made that records of any other type may be received in this manner. While we do not suggest that parties may not stipulate for the admission of such proposed evidence and waive objection thereto, no authority appears for the course contended by appellant. The exhibits will not be considered a part of the record for review.

The Commission (whose extensive findings and conclusions are set out in the attached appendix) properly found the office equipment and furniture in question were "used in the promotion of the organization including such purposes as record keeping and providing mailings to the membership." As to the religious nature of appellant, the Commission concluded that "while the appellant has some of the trappings and accouterments of an organized religion, it appears to be more an applied philosophy which has a certain religious connotation, but which falls short of *being devoted to the worship of the Supreme Being*, which this Commission concludes is necessary for the property owner to have its property considered exclusively for religious worship." (Emphasis ours.) Further that "an applied religious philosophy" is not identical for purposes of exemption "with an organized religion devoted to religious worship." The Commission then held: "The personal property of the appellant has not, therefore been shown to be used exclusively for religious or charitable purposes and therefore cannot be exempted from ad valorem taxation." Considering the findings and conclusions in their entirety and particularly those immediately above cited, it appears the order rests not on the lack of *exclusivity* or *extent* of use, but on the failure to show the character of the use as "for religious worship." The Commission determined the statutory and constitutional phrases "used exclusively for religious worship" postulate more than an "applied philosophy which has a certain religious connotation". It found the statute and constitution instead require a belief in and devotion to a Supreme Being. For reasons hereinafter discussed we affirm.

The term religious worship in the commonly accepted sense includes as a necessary minimum a belief in the Supreme Being of the universe. Generally religious worship is expressed by prayers, reverence, homage and adoration paid to a deity and include the seeking out by prayer and otherwise the will of the deity for divine guidance. Webster's New World Dictionary of the American Language, Second College Edition, copyrighted in 1974, defines religion as "belief in a divine or superhuman power or powers to be obeyed and worshiped as the creator[s] and ruler[s] of the universe; b) expression of such a belief in conduct and ritual." "Worship" is defined as "reverence or devotion for a deity; religious homage or veneration; b) a church service or other right showing this." In Webster's Third New International Dictionary, copyrighted 1976, religion is defined as "the personal commitment to and serving of God or a God with worshipful devotion, conduct in accord with divine commands esp. as found in accepted sacred writings or declared by authoritative teachers, a way of life recognized as incumbent upon true believers, and typically the relating of oneself to an organized body of believers." Another definition suggested is "a personal awareness or conviction of the existence of a supreme being or supernatural powers or influences controlling one's own, humanity's, or all nature's destiny." In this authority *worship* is defined as "the reverence or veneration tendered a divine being or supernatural power; also: an act, process, or instance of expressing such veneration by performing or taking part in religious exercises or ritual." Other dictionaries consulted provide similar definitions.

In 1890 the United States Supreme Court stated "The term 'religion' has references to one's view of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890). Similarly the Oklahoma Court of Criminal Appeals in *McMasters v. State*, 21 Okl.Cr. 318, 207 P. 566 (1922) defined religion as "all forms of belief in the existence

of superior beings, exercising power over human beings by volition, imposing rules of conduct with future rewards and punishments." Justice Hammer in *Nikulnikoff v. Archbishop and Consistory of Russian Orthodox Greek Catholic Church, et al.,* 142 Misc. 894, 255 N.Y.S. 653 (1962) described the term as "a bond uniting man to God and a virtue whose purpose is to render God the worship due him as the source of all being and the principle of all government of things." Mr. Justice Hughes in his dissent in *United States v. Macintosh,* 283 U.S. 605, 633, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931) (the dissent involved another issue) stated: "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." Joining in this dissent were Holmes, Stone and Brandeis. Hughes' isolation and identification of the indispensable ingredient of religion remains a basic guide in this area of the law. When considering the exemption provisions of the Selective Training and Service Act of 1940 for those conscientiously opposed to participation in war "by reason of religious training and belief" the 9th Circuit in *Berman v. United States,* 156 F.2d 377 (9th Cir. 1946) after citing the above quoted phrase on the essence of religion from *Macintosh* stated: [l.c. 380]

> "It is our opinion that the expression, 'by reason of religious training and belief' is plain language, and was written into the statute for the specific purpose of distinguishing between a conscientious social belief, or a sincere devotion to a high moralistic philosophy, and one based upon an individual's belief in his responsibility to an authority higher and beyond any worldly one. . . . We are not saying that man's comprehension of religion is static and remains today the same as a short hundred and fifty odd years ago in the area of our constitution-making. . . . Nature and God seem so close to Oneness that some thinkers blend them inseparately."

Commenting on the nature of religion the court stated, it "involves a process of vital and reciprocal interplay between the human and the supernatural.'" More recently the Supreme Court of Kansas in *Board of Trustees of the Kansas East Conference of the United Methodist Church v. Cogswell,* 205 Kan. at page 847, 473 P.2d at page 1 (1970), adopted and applied the definition of religion enunciated in *Davis v. Beason, supra,* as that intended by the Kansas constitutional and statutory provisions permitting tax exemption for "all property used exclusively for . . . religious purposes."

The Supreme Court in *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), (urged as authority for reversal by appellant) interpreting the Universal Military Training and Service Act and claimed exemptions by conscientious objectors under § 6–J, when reversing the convictions, addressed the meaning of the expression "religious training and belief" as used in the Act. The Act exempted those who opposed participation in war by reason of their "religious training and belief" and the court pointed out that the Act defined that phrase as "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code." [l.c. 165, 85 S.Ct. 853] The court observed that Congress had adopted by this definition the language of Chief Justice Hughes in *United States v. Macintosh, supra,* but substituted the phrase "Supreme Being" for the "Appellation God". The *Seeger* court, however, construed this substitution of terms as license to extend the Congressional intent to include a definition of "belief in a Supreme Being" as follows: "It is essentially an objective one, namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption."

Though announcing this diluted version as the intended legislative meaning of "religious . . . belief", the court nevertheless acknowledged that Congress had referred in the Act to "this higher authority". [l.c. 175, 85 S.Ct. 850] The *Seeger* definition is not one of constitutional construction

but of statutory interpretation neither controlling nor persuasive here for a number of reasons. Contrary to this appellant's argument that the Court in effect excised the concept of a Supreme Being from "religion" it can reasonably be said that when the court spoke of "claimed belief" as occupying "the same *place in the life of the objector* as an *orthodox belief in God holds in the life of one clearly qualified for exemption*," (Emphasis ours), the term necessarily includes God or Supreme Being. This because the "claimed belief" must equate qualitatively and quantitatively with the *place God holds* in the life of one clearly qualified for exemption (e. g., a devout member of the Society of Friends) and such would require a devotion to *God* (or an equivalent) accompanied by a divinely inspired rejection of violence in the form of war. It is against this or a similar orthodox standard of another "clearly qualified for exemption" that an objector's "claimed belief" must measure. In the alternative, *Seeger* may be said to mean that the "claimed belief" occupies the same place in the life of the objector as that which an orthodox belief in God holds in the lives of others clearly exempted, but the objector may choose not to use the word "God" or "Supreme Being". In that sense *Seeger's* interpretation of the Act seems more a matter of semantics than substance, but in no sense can that case be considered as declaring a constitutional standard circumscribing state action in the field of tax exemption.

■ Appellant directs our attention to other authority, the most notable, a decision of the California court of appeals in *Fellowship of Humanity v. County of Alameda,*

153 Cal.App.2d 673, 315 P.2d 394 (1957), which considered a claimed exemption from city and county property tax on the ground that the property was used "solely and exclusively for religious worship" within the meaning of the California Constitution. When defining the term religion the court held it is improper to include in the concept a belief in God or a Supreme Being. The court stated "the belief or nonbelief in a Supreme Being is a false factor," and went on to say "This simply means that 'religion' fills a void that exists in the lives of most men. Regardless of why a particular belief suffices, as long as it serves this purpose, it must be accorded the same status of an orthodox religious belief. . . . [T]he proper interpretation of the terms 'religion' or 'religious' in tax exemption laws should not include any reference to whether the beliefs involved are theistic or nontheistic. Religion simply includes: [1] a belief, not necessarily referring to supernatural powers; [2] a cult, involving a gregarious association openly expressing the belief; [3] a system of moral practice directly resulting from an adherence to the belief; and [4] an organization within the cult designed to observe the tenets of belief. The content of the belief is of no moment." Under this loose concept it is readily apparent any organization espousing moral principles, without theistic foundation, to which the membership openly express belief might opt for the exempt status. We are unwilling to ascribe such meaning to the expression "religious worship" in Missouri's tax law. Instead we conclude that the constitutional and statutory term religious worship of Art. X, § 6 and § 137.100 embody as a minimum requirement a belief in the Supreme Being.[5]

5. Appellant contends that requiring devotion to worship of the Supreme Being as a sine qua non to classification as religion and entitlement to exemption from ad valorem taxation would be in direct contravention of the First Amendment citing *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), and *Everson v. Board of Education of the Township of Ewing*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Appellant gives little explanation how these cases support its position and the cases do not justify the contention made. *Seeger*, discussed at length above, involves an interpretation of the Selective Service Act, with its main thrust defining the statutory terms religious belief and Supreme Being. *Torcaso* does not define religion, holding only that a state may not require an oath declaring a belief in God as a prerequisite for holding public office but indicated nothing that would limit a legislative grant of tax exempt status to religious organizations. *Everson* dealt with the constitutionality of the

Though appellant contends that worship of a Supreme Being is not indispensable to a definition of "religious worship", it argues nevertheless that Scientology "acknowledges the existence of God and recognizes and espouses devotion to a Supreme Being" establishing its entitlement to the exemption. It further argues no evidence supports the Commission's conclusion that Scientology "appears to be more an applied philosophy which has a certain religious connotation, but which falls short of being devoted to the worship of the Supreme Being." This brings us to the questions of credibility and burden of proof.

■■■■■ An administrative agency may base its decision solely on a finding of lack of credible testimony, though such testimony is uncontradicted or unimpeached. *Koplar v. State Tax Commission*, 321 S.W.2d 686 (Mo.1959). *Veal v. Leimkuehler*, 249 S.W.2d 491 (Mo.App.1952); *State ex rel. Kahler v. State Tax Commission*, 393 S.W.2d 460 (Mo.1965); and *Scott v. Wheelock Bros.*, 357 Mo. 480, 209 S.W.2d 149 (1948). However, the Commission may not arbitrarily disregard or ignore undisputed testimony of a witness not shown to have been impeached or disbelieved by the Commission. Such was the case of the county assessor in *Koplar, supra*. Unlike *Koplar*, the Commission here made the following findings as to credibility of the witness: "We find the testimony of the Reverend Frederick M. Rock generally not to be credible and worthy of belief in particular in

respect to his description and categorization of the activities of the organization, its alleged religious services, its financial structure and the nature of the so-called donations which are made to the organization. The Commission finds that there is no sufficient credible evidence presented by the appellant to satisfy the burden placed upon one claiming exemption from taxation." The Commission then concluded "that with the lack of credibility found by this Commission in the testimony of the witness Rock and the lack of corroboration by any independent authority on contemporary religions that the property owner *has not satisfied the burden* placed on him." While the Commission findings are not insulated from review, the court must "give due weight to the opportunity of the agency to observe the witnesses." The Commission had ample opportunity to observe the demeanor as well as the words of the witness and make a determination of credibility from its point of vantage. It recognized testimonial inconsistencies and those things petitioner failed to establish, finding that "appellant has some of the trappings and accouterments of an organized religion, it appears to be more an applied philosophy which has a certain religious connotation, but which falls short of being devoted to the worship of a Supreme Being." The Commission could properly consider the financial interest of the witness in the outcome of the proceeding and the absence of corroborating testimony.[6] Giving due

---

states (Maryland) providing bus service to parochial school students. It did not suggest principles pertinent to the issues here.

**6.** The Church of Scientology presented one witness, Frederick M. Rock, a recently ordained twenty-six year old minister of the church who detailed the beliefs, activities, functions and history of the church. He testified the church teaches the existence of God; that man has a spirit analogous to a soul; that religious services are conducted each Sunday which include a sermon and prayers; ministers of the church can perform marriage services, funerals, and christenings; the church has a creed and worship services similar to those of other religions; a code or doctrine and religious tenets which preach: (1) man is good but must struggle to survive, (2) man has a spiritual nature which

gives him inalienable rights, and (3) each person is responsible for and to the world; that the church is active in charitable works; a training program for ministers which was not characterized as a seminary; the church is an applied religious philosophy because it teaches a way of life relating to the spirit and to God; and finally that all the property in question is used to further the functions of the church. However, this picture was clouded by admitted atypical features. For example, Rev. Rock testified members of the Church of Scientology can actively practice and belong to other religious faiths (i. e., Catholic priests and Jewish rabbis belong and actively pursue the worship of the Church of Scientology); the church raises its funds by accepting "donations" for counseling services to members and non-members alike for which a fixed schedule sets the

weight to the opportunity of the Commission to observe the witness and the factors noted we find nothing sufficient to disturb its finding that the witness was not credible.

The law places a substantial burden on those claiming exemptions under the referenced constitutional and statutory provisions to establish that their property falls within an exempted class. *City of St. Louis v. State Tax Commission*, 524 S.W.2d 839 (Mo.banc 1975). It is firmly engrained that taxation is the rule and exemption therefrom the exception, *Midwest Bible and Missionary Institute v. Sestric*, 364 Mo. 167, 260 S.W.2d 25, 29–30 (1953), and such claims are not favored in the law. *Community Memorial Hospital v. City of Moberly*, 422 S.W.2d 290 (Mo.1967). The extent of this burden has been characterized as requiring proof beyond a reasonable doubt. *Fitterer v. Crawford*, 157 Mo. 51, 57 S.W. 532 (1900).

Weighing the evidence in light of the appellant's sole witness' want of credibility and against the substantial burden of proof required, we find the record supports the Commission findings.

The judgment is affirmed.

MORGAN, C. J., and BARDGETT, HENLEY, FINCH and DONNELLY, JJ., concur.

SEILER, J., concurs in result in separate opinion filed.

### APPENDIX

### MISSOURI STATE TAX COMMISSION

#### Findings of Fact

1. The Missouri Church of Scientology was organized in 1969 and is a not-for-profit corporation. The earliest incorporation of the Church of Scientology elsewhere in the United States was in 1954.

2. The property in question was used in its headquarters at 4221 Lindell on January 1, 1974.

3. There are ceremonies or services conducted on Sunday afternoons at the headquarters. These are the only regular services (Tr. 14).

4. These services are presided over by ministers.

5. The founder of the Church is L. Ron Hubbard who is still living.

6. There is literature which is disseminated which encourages other persons to join and there are other efforts made to achieve the same purpose.

7. The Missouri Church of Scientology also engages in public affairs such as conducting a drug counseling program.

8. The property in question consisting of office equipment and furniture is used in the promotion of the organization including keeping its records, providing mailings to the membership.

9. The Church of Scientology does not have formal seminaries but requires that prospective ministers go through counseling courses which are conducted in their headquarter buildings.

10. There is no formal membership roll for the Church of Scientology.

11. The Church of Scientology is an applied religious philosophy having as its members persons who belong to other formal religions such as members of the Catholic and Lutheran churches and including Catholic priests and Jewish rabbis (Tr. 23). Membership in other religious faiths does not preclude membership in the Church of Scientology.

---

charges, in either service or cash, however about ten percent of the counseling sessions are gratuitous; the church has no structured seminary but offers courses in which the student sets his learning pace and at the end of which he may be ordained as a minister; theirs is an applied religious philosophy teaching methodology and the church keeps no formal membership rolls. As to the interest of the

witness he was in the employ of the church receiving about $3,000.00 annually from monies raised in the St. Louis area. No attempt was made to corroborate Rock's testimony with that of church officials, parishioners, or others familiar with appellant and its system of beliefs. No income or expense statements were introduced and the sources of income and use of funds were ambiguous at best.

12. There was no corroborative evidence from any independent witness presented to the effect that the Missouri Church of Scientology is recognized by any other religious faiths as being a bona fide religion.

13. We find the testimony of the Reverend Frederick M. Rock generally not to be credible and worthy of belief in particular in respect to his description and categorization of the activities of the organization, its alleged religious services, its financial structure and the nature of the so-called donations which are made to the organization.

14. The Commission finds that there is no sufficient credible evidence presented by the appellant to satisfy the burden placed upon one claiming exemption from taxation.

### Conclusions of Law

1. Under Article X, Section 6 of the Missouri Constitution and Section 137.100 R.S.Mo. all property used exclusively for religious worship is exempt from taxation.

2. This Commission has jurisdiction of this proceeding and the parties hereto, and is the sole judge of the credibility of the witnesses appearing before it.

3. It is the function of the Commission to determine the credibility of witnesses and to judge what probative weight or value to give to their testimony.

4. As to claims for exemption from taxation the burden is on the owner claiming his property to be exempt to establish that his property falls within the exempted class. *National Cemetery Ass'n. of Missouri v. Benson*, 344 Mo. 784, 129 S.W.2d 842 (1939).

5. Exhibits which were marked and identified but which were never offered into evidence cannot be considered as such by this Commission in its capacity as the trier of fact.

6. Claims for exemption from taxation are not favored in the law and provisions for exemption are strictly construed against one who claims to be exempt.

7. It is concluded that with the lack of credibility found by this Commission in the testimony of the witness Rock and the lack of corroboration by any independent authority on contemporary religions that the property owner has not satisfied the burden placed upon him.

8. While the appellant has some of the trappings and accoutrements of an organized religion, it appears to be more an applied philosophy which has a certain religious connotation, but which falls short of being devoted to the worship of the Supreme Being, which this Commission concludes is necessary for the property owner to have its property considered exclusively for religious worship. The Commission does not believe that an applied religious philosophy is identical for purposes of exemption with an organized religion devoted to religious worship.

9. The personal property of the appellant has not, therefore, been shown to be used exclusively for religious worship or charitable purposes and therefore cannot be exempted from ad valorem taxation.

10. The decision of the Board of Equalization placing an assessment of $5,000.00 upon the personal property of the Missouri Church of Scientology for the year 1974 is herewith affirmed.

SEILER, Judge, concurring in result.

As I understand the situation, the only evidence offered by appellant before the commission was a witness whom the commission found not credible with respect to his testimony bearing on the issues. We are not going to disturb that finding. Beyond question, then, appellant has not carried the burden of establishing an exemption from taxation. In my opinion, this disposes of the appeal.

We should be careful not to do anything to restrict religious freedom and I am sure the principal opinion has no intention to do otherwise, but if it is necessary to define religious worship or religion, I do not believe we should restrict the definition to conventional orthodox religions, which it seems to me is what the principal opinion does. History shows that what is ortho-

doxy today was once heresy. I therefore concur in result only.