**RUSH v. SWIFT & CO.**

No. 22021.

Kansas City Court of Appeals.
Missouri.

May 3, 1954.

Lamm, Barnett & Wolfe, Lawrence Barnett, Sedalia, Brown, Douglas & Brown, R. A. Brown, Jr., St. Joseph, for appellant.

Crawford & Harlan, Earl T. Crawford and Sam P. Harlan, Sedalia, for respondent.

DEW, Judge.

From a judgment of the circuit court of Pettis County, reversing an award of the Industrial Commission of Missouri, the employer Swift and Company, has appealed.

On April 24, 1950, respondent, an employee of appellant, left her employment, complaining of illness from inhalation of gas. After confinement of 21 days, she worked most of the time until September 7, 1950, when she quit permanently. On April 24, 1950, she received some medical advice from appellant's physician. Appellant had never elected to come under the occupational disease provisions of the Workmen's Compensation Act of Missouri. Appellant, on May 26, 1950, reported respondent's illness to the Division of Workmen's Compensation of the Department of Labor and Industrial Relations. Respondent demanded full wages for loss of time. A conference was had in July, 1950, with the Referee of the Division of Workmen's

Compensation and on November 8, 1950, respondent brought suit against appellant and Robert L. Wiske, its plant manager, for $35,000 damages growing out of alleged negligence in failing to provide her with a reasonably safe place to work and other alleged acts of negligence. Upon motion of appellant the court stayed further proceedings in that case pending the disposition of the matter of jurisdiction of respondent's claim filed by appellant before the Division of Workmen's Compensation.

The appellant and its insurer filed a notice of disagreement in the Division of Workmen's Compensation claiming the disability was due to accident, and the matter of respondent's compensation was set for hearing before the referee. That hearing, as stated, was upon the filings made by appellant and its insurer, they contending that the injuries complained of by respondent resulted from an accident sustained in the course of her employment of which the Commission had jurisdiction, and respondent asserting that her complaints arose out of occupational disease of which the Commission did not have jurisdiction. Respondent preserved her objections to the jurisdiction of the Commission. The referee found that respondent suffered a compensable injury and awarded her $121.43 covering a period of temporary total disability of 4 6/7ths weeks at $25 a week, subject to a certain lien for attorneys' fees. The referee reported that the accident happened as follows: "The employee was working near a chicken 'singer' when she inhaled natural gas fumes."

Respondent appealed from the referee's report to the Industrial Commission of Missouri for a full review of the award and decision. After a full hearing before the Commission, and with additional evidence, the award of the referee was affirmed. Thereafter the respondent appealed to the Circuit Court, which reversed and set aside the award made by the Industrial Commission "on account of lack of jurisdiction of said Commission in the above entitled cause". The court also filed its memorandum, setting forth the reasons for its judgment. From that judgment appellant has appealed to this court.

The appellant asserts that the Circuit Court wrongfully substituted its own judgment for that of the Commission; illegally weighed the evidence and failed to consider the substantial evidence as a whole; that under the evidence the respondent sustained her injuries from a compensable accident arising out of and in the course of her employment.

Respondent insists that her illness on April 24, 1950, and subsequent conditions of ill health were the cumulative effect of inhaling gases and fumes in her place of employment during the whole year she was so employed; that the conditions of her place of employment as described were such as usually and ordinarily existed there and were not an exception; that emission of fumes and gases were due to the type of refrigerating plant and "singers" provided in her place of employment. She contends that her illness was not sustained as the result of an accident within the meaning of Workmen's Compensation Act, Section 287.020 RSMo 1949, V.A.M.S.

Appellant operates a poultry plant in Sedalia, Missouri. In the basement thereof is a dressing room where the fowls are dressed. This room is approximately 90 feet east and west and 60 feet north and south. In it chickens go through the various dressing operations and are carried on a moving chain to the various operators. Some 37 operators attend the various duties pertaining to this work. At one point the chickens are carried on the chain through the "singers", where the hair, fuzz and pin feathers are burned off. The "singers" consist of two ½ inch pipes, joined at the top and which straddle the carrier. These pipes emit gas flames through openings on their inner sides so as to singe the chicken as it passes between the pipes. Each "singer" pipe has a valve and there is an air valve, and when both pipes are lighted, the flames are thrown out from each pipe toward the other and the flames extend about seven inches along the pipes. There were no windows in this room but there was an opening in the south wall near the ceiling in which there was an exhaust fan designed to draw the air out of the room to

the outside of the building. There was also an air duct hung at the ceiling approximately 12 x 30 inches in size, with 8 or 9 openings for the purpose of conveying heat in the winter and ventilation in the summer. A fan on the outside was placed to force air into this air duct. Immediately in front of the "singer" pipes was a metal sheet, and respondent worked a few feet north. Adjoining this room was a machinery room, where ammonia was used in connection with refrigeration processes conducted by the plant.

Respondent had worked in the dressing room of the appellant's poultry plant for almost a year, being assigned to different operations and locations in the room. On April 24, 1950, respondent complained of illness from gas fumes but finished out the day. Thereafter she drove home in her husband's truck, taking two other women employees to their homes as an accommodation. She remained home until May 29, 1950, when she returned to her job and continued thereon until September 8, 1950, when, according to her testimony, she permanently quit the job on advice of her physician.

According to the testimony of respondent the flame of one or the other of the "singer" pipes would frequently extinguish, wholly or partially, and cause unburned natural gas to escape and to permeate the room; that this had been a matter of common occurrence "all the time I worked there"; that when the flame would go out it would not be relighted until the boss or someone would be found to relight it; that she could not reach the valve to do it; that at times when the flames were especially strong, they would be yellow in color and stand far out from the pipes and cause fumes; that once her hair nearly caught fire from the "singer"; that the flames had a musty smell that made her head ache, her throat dry, and mouth parched; that she often went home with a headache; that she would feel better when she got out into the fresh air, but would feel tired in the morning; that ammonia fumes were there "all the time", coming from the refrigeration room whenever the connecting door was open, and would make her eyes water and smart and cause her to cough; that she lost weight, going down to 105 pounds as compared to 140 pounds since she had left the job.

Respondent testified that on the morning of April 24, 1950, she smelled the gas and complained to the other women working nearby; that she told the foreman she was sick from the fumes; that he told her he did not think it was gas and told her to move further from the "singers"; that she moved away, drank some cold water and took aspirin, but got sicker; that she finished the day's work and drove home in her husband's truck. Her husband called the family doctor. The company doctor came once. The family doctor later referred her to a doctor in Kansas City. She returned to work on May 29, 1950, and worked until September 9, when she permanently quit on her doctor's instructions. She testified that she still has pains in her chest, has frequent headaches, coughing spells and low blood pressure. She is weak and gets dizzy when she attempts to exert herself. She said her health was good before she worked for the appellant.

Bell Galloway, a former employee, during part of the period in question, testified that about every day ammonia fumes would come into the dressing room from the engine room and would cause tears to run from her eyes, and would "burn" her when she breathed, and cause her to cough. She said there were no windows in the room and no open doors, and that she saw no fan that drew the air out. She said she heard other women complain of the conditions and saw one girl faint. She heard respondent complain to the foreman about fumes; that the "girls was always complaining" to the boss about the gas fumes. She herself fainted one time when the smell of gas was strong and there was not enough fresh air. She said the air ducts threw out steam in the summer instead of cool air, and that the exhaust fan drew only feathers from the room and not the fumes. She too, has a claim pending for compensation.

Hattie Sizemore, another former employee, who worked at the plant when respondent did, testified that the gas flames came out of the "singers" in such force at times as to blow away from the pipes in a yellow flame and cause fumes; that the flames would some times go out or partially out and stay out "until it would suit somebody to fix it"; that the gas made her sleepy and tired; that she complained to George Craig, the foreman; "you could smell gas and ammonia fumes. It was stagnant all the time"; it made her head ache and her eyes burn.

Mr. Franklin, former elevator operator at the plant, testified that he never saw any windows or outside doors open in the poultry room; that the chicken wire over the exhaust fan was always covered with feathers and dirt; that "any day down there you would find fumes in the place"; that the gas fumes would give one a headache "if you were there long enough"; "I seen lots of guys' eyes full of water because of the fumes". "It gave me a headache and sore eyes".

Joseph G. Hawthorne, a chemist, witness for the appellant, testified that there was usually an odor of ammonia around the refrigeration machinery, and that there was a slight odor in the engine room.

M. E. Latham, the chief engineer of the plant, said that there was bound to be a slight leakage of ammonia in a machine with a rod operating a piston, but not enough to be harmful; that he could not smell it himself.

Dr. A. R. Maddox, the family physician, testified that he treated respondent while she was home after April 24, 1950; that she developed hypostatic pneumonia. He later recommended that she consult experts in Kansas City.

Dr. Sam H. Snyder testified that in October of 1950, he examined the chest of the respondent with a stethoscope and X-ray, took her blood pressure and sent her to an X-ray specialist for bronchial visualization. She had evidence of severe bronchitis, low blood pressure, and was under-nourished and thin. From her history and his examination he concluded that she had inhaled noxious gases during her employment. She complained to him of cough and expectoration, pain in the center of the chest, and a weak and tired feeling. He explained that breathing of natural gas in the course of one's employment of at least a year would produce an irritation of the bronchial tree with coughing and expectoration. He said that if the patient's health had been good before exposure to such fumes that the symptoms he found in respondent would, in his opinion, be due to her working conditions. It was also his opinion that inhaling ammonia fumes for a period of a year would tend to produce bronchitis, with low blood pressure. He said he could not determine whether respondent would completely recover, but she was improving some. He suggested medical attention and treatment for a while.

In behalf of appellant its foreman stated that he never knew of flames of the "singer" pipes going out; that if the flames in one went out, it would be relighted from the flames from the other pipe; that respondent had never complained of the flames going out nor had anyone else done so. Mr. Latham also testified that he did not know of the flames of the "singer" ever going out. There was other testimony that the exhaust fan was kept clean and operated to ventilate the room. An inspector testified that he found no gas leakages and no other reasons for complaint in the working conditions in the room.

The company physician examined respondent on March 15, 1951. He said she complained of dizziness, and burning in the throat, and claimed to be gassed while working at Swift and Company on April 24, 1950. He said, according to his examination of her heart, pulse, blood pressure, blood count and weight he found her condition normal in those respects and detected nothing organically wrong. He said he found no condition which could be attributed to natural gas, ammonia or monoxide gas.

Prior to returning to her job, the respondent made a written statement of her

complaint to the appellant, which was written for her by a cousin. This statement was introduced by the appellant. The substance of the statement was that on April 24, 1950, while working by the "singers" respondent became asphyxiated by natural gas fumes escaping from the gas pipes; that the fumes made her sleepy and drowsy and grew worse and she suffered extremely painful headache, her mouth became oily, and her throat burning. She became sick in her stomach. She bathed her face several times and ate ice to soothe her throat. She complained to Charles Hainey, foreman, who advised her to move further from the "singers"; that he turned on the circulating fans and the fresh air eased respondent's condition somewhat so that she could finish out the day. The fans were insufficient and her condition returned. One of the women bathed respondent's face and respondent rested about thirty minutes in the ladies' rest room and then went home. Her husband 'phoned the foreman to learn what doctor the company prescribed in such a case. The foreman instructed him to call Dr. Traber. That doctor advised her to rest where there was an abundance of fresh air, and to take aspirin. The doctor did not come to the residence but said that was all he could do. Respondent's husband then notified the family doctor, Dr. Maddox, who called the following Saturday. Respondent was bedfast from April 24 to May 5. From the latter date until she returned to work she was out of bed occasionally, but did not stay up long, due to dizziness, pains in the chest, coughing spells and extreme weakness. When she returned to work she did so as a matter of forcing herself, although she was not completely recovered. The doctor permitted her to return as a matter of trial to ascertain whether she was capable of continuing her work.

Section 287.020 RSMo 1949, V.A.M.S., defines "accident" as follows: "The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury."

The word "injury" and "personal injuries" are defined in subsection 3 of the above section as follows: "The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. The said terms shall in no case except as herein provided be construed to include occupational disease in any form, nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment, nor shall they include death due to natural causes occurring while the workman is at work."

An occupational disease has been defined as follows: "An occupational disease is one which is the natural incident or result of a particular employment and is peculiar to it, usually developing gradually from long continued work at the employment, and serving to attach to the employment a hazard which distinguishes it from the ordinary run of occupations and is in excess of the hazard attending employment in general." Tindall v. Marshall's U. S. Auto Supply Co., 348 Mo. 1189, 1196, 159 S.W.2d 302, 305.

We must first consider the scope of our review of this proceeding. The law on that point is succinctly stated in Dyche v. Bostian, 361 Mo. 122, 126, 233 S.W.2d 721, 723, as follows: "As to the law. The principal opinion in the Court of Appeals points out that under Art. V. Sec. 22, Const.Mo.1945, M.R.S.A., our courts, in reviewing the final decisions and findings of any constitutional or statutory administrative body which are judicial or semi-judicial, shall have power to determine whether the same are authorized by law and supported by competent and substantial evidence on the whole record. And our decisions have held that the courts are authorized to determine whether the administrative tribunal 'could have reasonably made its findings, and reached its result, upon a consideration of all of the

evidence before it; and to set aside (administrative) decisions clearly contrary to the overwhelming weight of the evidence.'"

Such definition of the scope of review in such cases is found in Wood v. Wagner Electric Corporation, 355 Mo. 670, 674, 197 S.W.2d 647, 649, in which the court said regarding the scope of review that the reviewing court is not permitted to substitute its own judgment on the evidence for that of the administrative tribunal, "But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence. Of course, the reviewing court should adhere to the rule of deference to findings, involving credibility of witnesses, made by those before whom the witnesses gave oral testimony." Similar statements are contained in Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55; Brown v. Weber Implement & Auto Co., 357 Mo. 1, 206 S.W.2d 350; Kansas City v. Rooney, 363 Mo. 902, 254 S.W.2d 626, en banc; Ossery v. Burger-Baird Engraving Co., Mo.Sup., 256 S.W.2d 805; Cebak v. John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262, 264, and Thacker v. Massman Const. Co., Mo. Sup., 247 S.W.2d 623, 627. In the last named case, the court said, 247 S.W.2d at page 627: "In determining these issues we first view the record in a light most favorable to the findings of the Commission, consider the favorable inferences which the Commission had a right to draw from the evidence before it, and then determine whether the Commission's findings, *even if supported by competent and substantial evidence,* are contrary to the overwhelming weight of evidence in the whole record." (Italics supplied.)

The Circuit Court, in the course of its memorandum filed with the judgment in the instant case, after reviewing the evidence, said: "In the present case, according to the testimony there was present in the room where claimant Grace Rush worked, not only natural gas and carbon monoxide gas, but ammonia fumes as well. If the evidence is to be believed these gases in harmful quantities (affecting the eyes, throat and lungs) were continually present on account of the negligence of the defendants, and the condition had existed for a long time. From the evidence claimant developed a low blood pressure, anemia and hypostatic pneumonia. If the evidence is to be believed there was substantial proof of a gradual and cumulative condition caused by inhalation of the gases while at work; unlike the facts in the Tindall case plaintiff's injuries were due, if the evidence is to be believed, to the inhalation of gases over a considerable period of time rather than to any one exposure; also she felt better but made no complete recovery by going out into the fresh air:

"From a study of the record, i. e. the evidence, and an examination of the statutes and authorities submitted, I am of the opinion the Claimant did not meet with an accident, within the meaning of the Act. If this is correct then, of course, the Commission did not have jurisdiction".

As we understand appellant's position, it does not take issue here with the Commission's finding that respondent became ill on April 24, 1950, from inhaling natural gas in the course of her employment. It is true that appellant makes the point that in neither the written claim made by respondent, nor in the Commission's finding is there any mention of illness arising from ammonia fumes, whereas the Court found the evidence to disclose that respondent's illness arose out of long continued exposure to natural gas, monoxide gas and ammonia fumes, as well. The testimony of the respondent as to the frequent presence of ammonia fumes, their source and effect on her were admitted without objection. Furthermore, if respondent suffered from inhalation of gas in the place and in the course of her employment, as the Commission found she did, appellant was in a better position to know what kind of gas or fumes she was exposed to, and

is not prejudiced by the evidence and findings of the existence also of ammonia gas in the plant.

In the case of Tindall v. Marshall's U. S. Auto Supply Co., supra, it was held that although the evidence showed noxious gases were common in garages such as that in which the plaintiff therein was employed, it was not shown that such gases were commonly present in such harmful quantity as to cause disease or injury. It was shown in that case that when such gases existed, it was due to shutting off the air from the outside, which "constitutes an unforeseen event, happening more or less suddenly and violently and producing objective symptoms of an injury within the meaning of the Compensation Act." Plaintiff's illness was there found to be an accident within the meaning of the Act.

In the recent case of McDaniel v. Kerr, Mo.Sup. en banc, 258 S.W.2d 629, the plaintiff was employed to knock off old plaster on the ceilings and walls of some of the rooms of a hotel which was being remodeled. Out of consideration of the guests, the doors to the corridors were closed leading from the rooms in which plaintiff was working. His work caused excess fog, dust, sand, lime and dirt to permeate the air of the room in which he was working and much of the time there was no ventilation at all. He was not furnished with a respirator or mask although he requested one. He was in good health when he entered the employment, was 38 years of age and afflicted with some nasal obstructions. After several months of this sort of work there plaintiff developed a cough, a cloudy deposit would formulate in his mouth and his nose would be stopped up. After having worked on the job nearly a year, the plaintiff suffered pains in his chest and he consulted a doctor. It was ascertained that he had an abscess in the right lung, was put to bed, and later his right lung had to be removed. He brought suit against the employer for damages for his injuries, claimed to have resulted from the negligence of the defendant in not providing him with a reasonably safe place to work. A judgment was rendered for the plain-

tiff and the trial court set the same aside on the ground that the plaintiff's remedy was under the Workmen's Compensation Act. It was claimed there, as here, that plaintiff's injuries resulted from an accident arising in the course of his employment. The court there said, 258 S.W.2d at page 635: "The evidence in this case wholly fails to show an 'accident' within the meaning of the Workmen's Compensation Act as previously construed by this court. The dust which filled the air plaintiff was required to breathe and the dust which irritated his lungs and brought about the disease and injury of which he complains was not the result of any 'accident' or any unexpected or unforeseen event happening suddenly and violently with or without human fault. * * * The presence of the dust in the air was caused by the usual and normal progress of the work. The evidence wholly fails to show that its presence was due to any unusual, unforeseen or unexpected event arising suddenly and violently in the progress of the work. The presence of the dust in the air and its contact with plaintiff's body and lungs and the results there produced were not the result of an 'accident' as that term is used in the Workmen's Compensation Act and the circuit court was not without jurisdiction of the cause in question by reason of the Workmen's Compensation Act." See, also, Gillett v. Prairie Brass & Metal Co., Mo.App., 179 S.W.2d 494; Rogers v. Sikeston Compress & Warehouse Co., Mo.App., 248 S.W.2d 672.

■ Giving to the testimony in the case at bar the inferences most favorable to the Commission's award, it would appear that respondent became ill from inhaling natural gas fumes during the course of her employment. There is no evidence that the presence of the fumes or the causes thereof were conditions arising suddenly and violently on April 24, 1950, but the overwhelming weight of the evidence is that such conditions had existed frequently and intermittently throughout the whole period of respondent's employment of nearly a year, and that her repeated exposures and for long protracted periods

had the cumulative effect of causing her illness to which she succumbed on April 24, 1950. Under such weight of the evidence the Commission could not have reasonably made its findings and reached its result, upon consideration of all the evidence, that respondent's illness was an "accident" in the sense of the Compensation Act, and its decision so finding should be set aside as clearly contrary to the overwhelming weight of the evidence. The judgment of the Circuit Court in so doing was correct. The judgment of the Circuit Court is affirmed. All concur.