STATE of Missouri, at the Relation of Elma BOND, Relator-Appellant,

v.

Harry SIMMONS, Walter Haeussler, and Mrs. Richard Hoffman, Constituting the Civil Service Commission of the City of St. Louis, Missouri, Respondents.

No. 29488.

St. Louis Court of Appeals.

Missouri.

Feb. 28, 1957.

David M. Grant, St. Louis, for relator-appellant.

James V. Frank, City Counselor, and William B. Anderson, Asst. City Counselor, St. Louis, for respondents.

MATTHES, Judge.

This is a proceeding brought under the Administrative Procedure and Review Act, Chapter 536 RSMo 1949, V.A.M.S., to review the decision of the Civil Service Commission of the City of St. Louis, hereinafter called Commission, filed August 10, 1955, finding that the order of dismissal of relator from her position as elevator operator in the Civil Courts Building, St. Louis, Missouri, was reasonable, and that she had been discharged for just cause.

Following final action of the Commission, and on September 8, 1955, relator filed her petition for a *writ of certiorari* and review in the Circuit Court of St. Louis, Missouri. That court issued its *writ of certiorari*, and pursuant thereto respondents filed their return, which included a true and complete transcript of the entire record, proceedings, and evidence before the Commission. The Circuit Court entered judgment finding that the decision of the Commission was authorized by law, and on the face of the entire record was supported by competent, substantial evidence; that the finding was not arbitrary, capricious, or unreasonable, and did not involve an abuse of discretion. From this judgment relator has perfected her appeal to this court.

■ We note at the outset that the action of the Circuit Court in issuing writ of certiorari pursuant to application therefor was not in accord with the procedure contemplated by the Constitution, Article V, Section 22, V.A.M.S., and the applicable statute. When, as in the instant case, there is a contest of the issue involved in the proceeding before the administrative agency, judicial review of final action of such tribunal is governed by Sections 536.100 through 536.140 RSMo 1949, V.A.M.S. (Section 536.110, amended Laws of Missouri 1953, page 679); Ruedlinger v. Long, Mo.App., 283 S.W.2d 889. Certiorari is authorized, however, in *noncontested* cases by express provision of Section 536.105, Laws of Missouri 1953, page 678. Although the precise remedy to se-

cure review was not pursued, the appeal will not be dismissed. Relator did, within thirty days from the decision of the Commission, take action to secure a review by the Circuit Court whereby that court acquired jurisdiction, and we will therefore consider the case as though petition for review had been filed. Ruedlinger v. Long, supra.

The substance or gist of the three points appearing in relator's brief is that the finding and order of the Commission was based upon incompetent evidence; is not supported by competent and substantial evidence; and upon the whole record is arbitrary, capricious, and unreasonable, and resulted from an abuse of discretion.

■ The Constitution, Article V, Section 22, V.A.M.S., provides for a direct review by the courts as provided by law of all final decisions, findings, etc., of any administrative body, and such review shall include a determination of whether the decision is authorized by law, and is supported by competent and substantial evidence upon the whole record. It is now well settled that this does not mean that the Circuit Court or Appellate Court may substitute its judgment on the evidence for that of the administrative tribunal. Rather, the court making the review is authorized to decide whether such tribunal could have reasonably made its findings and reached its result upon consideration of all the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence. The reviewing court should adhere to the rule of deference to findings involving credibility of witnesses made by those before whom the witnesses testified. Wood v. Wagner Elec. Corp., en Banc, 355 Mo. 670, 197 S.W.2d 647; Dittmeier v. Missouri Real Estate Commission, Mo.App., 237 S.W.2d 201; Coleman v. Hercules Powder Co., Mo.App., 284 S.W.2d 32; Ulman v. Evans, Mo.Sup., 247 S.W.2d 693; Fleming v. Holland, Mo.App., 260 S.W.2d 840; Willens v. Personnel Board of Kansas City, Mo.App., 277 S.W.2d 665.

Relator's separation from service was based upon this formal charge lodged by the dismissing official:

"The employee has committed an act to the prejudice of the service. Unwilling to perform the duties of her position in a satisfactory manner. Insubordination."

The acts of commission and omission forming the basis for relator's discharge apparently were climaxed by an incident which occurred on May 19, 1955. On the morning of that day, the Honorable Robert L. Aronson, a Judge of the Circuit Court within and for the City of St. Louis, entered the Civil Courts Building on the first floor, desirous of going to his chambers located on the fifth floor. The judge testified that Mrs. Bond, relator, brought an elevator down and stopped at the first floor. She was told by Mrs. Blanche Edwards, designated as the elevator starter, and who supervised the operation of the elevators, "to take the people up over there". Instead of complying Mrs. Bond replied: "I have to go to the basement", and thereupon closed the door and descended to the basement where, according to Judge Aronson, she remained for approximately half a minute, during which time Mrs. Edwards sounded the buzzer repeatedly—"a dozen times". When relator appeared again at the first floor, the judge entered the elevator, and during its ascent to the fifth floor he informed her, in response to a statement that she was trying to do her work, "No, for a long time you haven't tried to do your work, and this is the finish as far as I'm concerned." After reaching his office, Judge Aronson wrote a letter to the proper authority describing the incident. The judge's testimony was not, however, confined to the occurrence hereinabove related. He stated, "I would say that Mrs. Bond's refusal to do a full job in the carrying of passengers has been continuous. * * * she would stand at the door of her elevator on the first floor * * * mumbling that she wasn't going to go at that time, and waiting beyond the time that Mrs. Edwards, by pointing her hand, directed people to go to this side of the corridor or that; and there are instances where the button would be pushed to come down from the fifth floor, the light would flash on, the elevator goes on. Taking the next elevator, I checked to see whose car had gone by without stopping. It was Mrs. Bond. That happened many times."

Mrs. Edwards not only corroborated Judge Aronson's version of the May 19th occurrence, but supplemented it by testifying:

"Q. Was that an unusual occurrence, her closing the door and proceeding downstairs? A. It really was. If there was a passenger, I didn't see it, and if there was, she should have answered my signal.

"Q. Have you ever instructed Mrs. Bond to answer your signal? A. I have on numerous occasions.

"Q. Is that one of her duties? A. That is one of her duties to answer that signal.

"Q. That morning, on the 19th of May, did you signal her to come down? A. I signaled her when she was between the third floor, I'm sure, the first time, to direct my passengers there."

The event was also reported by Mrs. Edwards to her "superiors".

Summarizing Mrs. Edwards' testimony concerning other acts of relator relied upon to support the charge of insubordination, we find that relator objected to operating the elevators by use of the electric signals; on occasions, instead of taking passengers, she would "close her door and go up". She refused to work with Mrs. Edwards, and in one instance told her, "I'm not taking any orders from you, there is nothing you can do about it." In March, 1955, relator closed the door and ascended with the elevator without passengers. In this case Mrs. Edwards "pleaded with her and told'

her it was a bad example for the others, * * *." Under interrogation by the Chairman of the Commission, Mrs. Edwards testified that, " * * * Mrs. Bond has constantly told me she accepted no orders from me, and she will not work with me. She accepts no orders from me * * * she'll not cooperate with me." Mrs. Edwards concluded her testimony by stating that relator, although a good operator, capable of doing a good job when she wanted to, refused for some unknown reason to cooperate with her.

By Hubert William Guth, Superintendent of the Municipal Buildings, it was shown that relator " * * * wouldn't operate the cars she was supposed to operate, she was lax on the job, and this had been going on for approximately three—I'd say three and a half years, these conditions, and she had been warned. She was called over to Mr. Baum's office in '54 and told by Mr. Baum personally, if she didn't correct these conditions she'd be dismissed". This official related that he had spoken to Mrs. Bond concerning her failure to heed signals and make stops in accordance with the signals.

Ben Hertenstein, the Building Operation Supervisor, testified that, "We had numerous complaints about her. (Mrs. Bond) I don't mean to state that every time she run an elevator we got one, but we had a lot of complaints. I had people complain about her." He pin-pointed the nature of relator's unsatisfactory performance in this manner: " * * * she would close doors in the face of passengers. She would bring her car down to the floor and open it and close it, and she'd get up on the tenth floor with her car and not operate. She'd get out of her car, she'd get on the first floor and talk over to other girls. She generally did things we just don't like the elevator operators to do in that way."

It was also established by records that relator was suspended for one day in April, 1954, because she left the elevator without official permission.

To contradict the evidence offered in support of relator's dismissal and as a defense to the charge, relator gave this version of the episode of May 19th: In bringing the elevator down she stopped at the sixth floor where Clarence Young, messenger for Honorable O. P. Owen, another Circuit Judge, entered the car. Between the sixth and first floors she did not hear the buzzer or observe any signal. Upon stopping the elevator and opening the door at the first floor, relator saw only Mrs. Edwards in the corridor. After stating "basement", she proceeded downward to that floor or level where Mr. Young left the car. Relator immediately returned to the first floor where Judge Aronson entered the elevator and was taken to the fifth floor. Relator categorically denied having "deliberately failed to cooperate with * * * Mrs. Blanche Edwards". She never told anyone she couldn't be fired; she insisted she consistently operated her elevator on signals. Relator recalled having appeared on a prior charge before the Commission in 1951, and that since that hearing she had been "especially cautious". She blamed her present dilemma upon a clique of about five other operators with whom, according to relator, Mrs. Edwards was friendly and to whom special favors were granted. In general relator's testimony may be characterized as constituting a denial of all charges leveled against her, and an assertion that she had rendered efficient service in accordance with the rules and regulations governing operation of the elevators.

Clarence Young's testimony was substantially in accord with relator's version of the incident in which he was a participant to the extent that he was the party who was taken to the basement. His purpose in going there, according to his testimony, was to take a basket of rubbish from the Judge's chambers. Young's understanding of the effective rules was that rubbish was to be taken directly to the basement. He stated he heard relator say "basement", after the elevator was stopped at the first floor and he did not see Judge Aronson standing in the lobby at that time.

It was also established as a fact that three appraisals of relator's services had been made to the Department of Personnel. These reports, covering the periods of October 31, 1951, to October 31, 1952; October 31, 1952, to October 31, 1953; and November 6, 1953, to November 6, 1954, are a part of the record. They were signed by the elevator starter and Mr. Hertenstein. In each instance relator's rating was designated as "good" or "adequate", and nothing of a derogatory nature appears on any of them. Bearing upon the failure of the authors of the reports to disclose the infractions concerning which testimony was given, Mr. R. Elliott Scearce, the Director of Personnel, stated that "reprimand and disciplinary action" are reported on another form, and that it was unusual for the official making the service rating report to record thereon any remarks which could be construed as a reprimand.

■ Interwoven with the basic point raised by relator is the contention that the Commission's decision was based upon hearsay evidence, conclusions of witnesses, and inflammatory matter. We recognize that in dealing with hearings before an administrative official or tribunal, our courts have declared and ruled that technical rules of evidence do not control. While leading questions and other informalities may be permitted, it does not follow that the fundamental rules of evidence can be abrogated and nullified. State ex rel. De Weese v. Morris, 359 Mo. 194, 221 S.W.2d 206, loc. cit. 209. Thus hearsay evidence and conclusions based upon hearsay do not satisfy the "competent and substantial evidence upon the whole record" requirement essential to validity of a final decision. State ex rel. De Weese v. Morris, supra, 221 S.W. 2d loc. cit. 209, and cases cited; Dittmeier v. Missouri Real Estate Commission, supra, 237 S.W.2d loc. cit. 206.

It is quite obvious that, notwithstanding an attempt by the Commission and counsel to observe the fundamental rules of evidence, hearsay testimony, voluntary statements, and conclusions by the witnesses crept into the proceeding. But it is equally apparent that in the main the evidence that was presented was competent and relevant to the issue being heard. This is demonstrated by the résumé of the testimony which we have herein made.

■ In resolving the question before us we must adhere to the principle that the record be viewed in the light most favorable to the finding of the Commission, and consider the favorable inferences which the Commission had the right to draw from the evidence before it, and then determine whether the decision of that tribunal, even if supported by competent and substantial evidence, is contrary to the overwhelming weight of the evidence. Thacker v. Massman Const. Co., Mo.Sup., 247 S.W.2d 623, 627; Rush v. Swift & Co., Mo.App., 268 S.W.2d 589; Szcpanski v. Stephen Gorman Bricklaying Co., Mo.App., 279 S.W.2d 191.

■ It is clear from the evidence, the substance of which we have outlined, supra, that there was a sharp conflict therein respecting the incident of May 19, 1955, and the demeanor of relator generally bearing upon the charge of insubordination. In this situation the Commission, as the trier of the facts, was required to pass upon the credibility of the witnesses who appeared before that body, Brown v. Krey Packing Co., Mo.App., 271 S.W.2d 234; Gilden v. Dorsa Dresses, Mo.App., 160 S.W.2d 484, and had the right to accept as true the facts testified to in support of the dismissal of relator. Crawford v. A. J. Sheahan Granite Co., Mo.App., 211 S.W. 2d 52.

■ Since the decision of the Commission is clearly based upon an abundance of competent and substantial evidence, and is not against the overwhelming weight of the evidence, the judgment appealed from must be affirmed. It is so ordered.

RUDDY, Acting P. J., and GEORGE P. ADAMS, Special Judge, concur.