Don **SPEER,** Petitioner–Appellant,

v.

**CITY OF JOPLIN,** Respondent–
Respondent.

No. 17966.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 14, 1992.

John A. Woodard, Clapper & Woodard, Monett, for petitioner-appellant.

Michael D. Talley, Joplin, for respondent-respondent.

FLANIGAN, Judge.

On November 10, 1989, the City of Joplin terminated the employment of appellant Don Speer, a sergeant in the Joplin Police Department. Speer appealed to the Personnel Board of the City of Joplin, (the Board). The Board, after an evidentiary hearing, upheld the termination. Speer filed a petition for judicial review in the Circuit Court of Jasper County. The court entered judgment affirming the Board's decision. Speer appeals.

Speer's first point is that the Board erred in upholding his termination "because the City failed to present competent and substantial evidence that Speer had committed any act warranting his dismissal, in that both the City and the Personnel Board relied on hearsay to support the decision to terminate."

Chapter 536, RSMo 1986, relates to rules of administrative agencies, procedures by and before agencies, and judicial review of administrative decisions. *Hunter v. Madden*, 565 S.W.2d 456, 458[3] (Mo.App.1978). It is applicable to municipal as well as state agencies. *Id.* See *State ex rel. Leggett v. Jensen*, 318 S.W.2d 353, 356[2] (Mo.banc 1958).

In *Gamble v. Hoffman*, 732 S.W.2d 890 (Mo.banc 1987), the court said, at 892:

Judicial review of administrative factual determinations is limited to whether the decision was supported by substantial and competent evidence, to whether the decision was arbitrary, capricious, or unreasonable, or to whether the agency action constituted an abuse of its discretion. The evidence is to be viewed in a light most favorable to the agency decision. If the evidence supports either of two contrary conclusions, the agency decision must prevail. When an agency sits as an administrative tribunal, determination of the credibility of the witnesses is an agency function. The reviewing court may not substitute its own judgment and the court may not set aside the administrative decision unless clearly contrary to the overwhelming weight of the evidence. (Authorities omitted.)

■ Although technical rules of evidence are not controlling in administrative hearings, fundamental rules of evidence apply. *Mo. Church of Scientology v. State Tax Comm.*, 560 S.W.2d 837 839[3] (Mo.banc 1977). Hearsay evidence and conclusions based upon hearsay do not qualify as "competent and substantial evidence upon the whole record" essential to the validity of a final decision of an administrative body under § 22 [now § 18], art. V of the Missouri Constitution of 1945. *State v. Morris*, 221 S.W.2d 206, 209[5] (Mo.1949). *State v. Simmons*, 299 S.W.2d 540, 545[4] (Mo.App. 1957).

On September 1, 1989, Police Chief Michael Wightman and Personnel Director Paul Corley gave Speer written notice of charges made against him with respect to his conduct as a police sergeant during the summer of 1989. The charges were set forth in eight counts, each accompanied by

factual particulars and citations to department rules and regulations. Attached to the notice were transcripts of statements of various witnesses. Speer filed a written response to the charges.

On September 18, 1989, Speer, with his attorney, appeared at a fact-finding hearing attended by Chief Wightman, Personnel Director Corley, two police lieutenants and the city attorney. On November 10, 1989, City Manager Leonard Martin, Chief Wightman, and the acting personnel director, notified Speer that his employment was terminated and that he had a right to appeal to the Board. In August 1990, after an extended evidentiary hearing participated in by the City and Speer and their respective attorneys, the Board upheld the termination.

The record defies complete summarization. The transcript of the hearing before the Board is voluminous. Many exhibits, some quite lengthy, were introduced by both sides.

Speer does not challenge the sufficiency of the notice of the charges. In general, the Board found, in its written conclusions: Speer was habitually late for work and left work early without proper authority or knowledge of his division commander; Speer was not available to his team of officers to supervise them, answer questions, or interpret departmental policy; Speer was perceived by his team members to be incompetent in the performance of his duties; on June 28, 1989, Speer, without authorization or permission, slid a ruler under the locked office door of Lt. David McCracken for the purpose of removing, reading and disseminating confidential material contained in an envelope lying on the floor; on two occasions Speer, while on duty and without the knowledge or permission of his supervisor, went to Carl Junction, Missouri, and to Carthage, Missouri; in May 1989, Speer, while in his police uniform, attended a party at an apartment in Joplin, at which time he consumed alcohol.

The foregoing findings of the Board represented findings of guilty on five of the eight counts. One count was dismissed by the City prior to the hearing before the Board. With respect to the other two counts, the Board found that the City failed to sustain its burden of proof.

With regard to the guilty findings, the Board stated: "The Board finds that the above violations substantiate the City's reason for discharge under the City of Joplin Personnel Rules and Regulations in effect both prior to and after October 1989, and the City of Joplin Police Department Rules and Regulations, and therefore upholds the City of Joplin's discharge of Don Speer."

The City's witnesses at the hearing before the Board included Patrolman Jim Hounschell, Dispatcher Opal Roberts, Dispatcher Steve Duncan, Sgt. Terry Fowks, Dispatcher Don Moser, Personnel Director Paul Corley, Lt. Dale Owen, Cpl. Brian Simmons, Personnel Director Max Baker, City Manager Leonard Martin, Cpt. David McCracken, and Chief Michael Wightman. Speer testified in his own defense and produced Officer Gary Massa, Officer Annette Williams, and Officer J.D. Love.

Hounschell testified: I served under Speer as a patrolman in the summer of 1989. Whenever we had a problem, we were to go to the supervisor and get his opinion on how to handle it. Most of the time we were unable to locate Speer. We could not reach him by radio, and the dispatcher could not find him. Even when Speer was there, we were frequently unable to get an answer to questions. I depended on another supervisor to answer my questions. Speer was 10 minutes late almost every night. We were on the midnight shift, which ended at 7:30 a.m. As a rule, Speer would leave at 2 a.m. or 3 a.m. Speer did that on the average of seven nights out of eight. Speer's conduct was a subject of discussion among the team members, and it adversely affected team morale. Speer was not supervising his team. The team members were Speer, Simmons, Massa, Love, Cooper and me.

Opal Roberts testified: In May 1989 there was a housewarming party at an apartment in Joplin. Several people, including employees and non-employees of the City, attended the party. Speer was in

uniform and drank some punch which contained alcohol. Speer had a refill.

Steve Duncan testified: In the summer of 1989 I was a dispatcher during Speer's shift. I tried to communicate with Speer but he was hard to locate. He was more difficult to locate than other supervisors. Speer's team would complain about not being able to locate Speer. I was present at the party mentioned by Opal Roberts. Speer was in uniform and had a drink.

Terry Fowks testified: In the summer of 1989 my shift overlapped the shift headed by Speer. My team was on from 4 p.m. to 2 a.m., and Speer's team was on from 9:30 p.m. to 7:30 a.m. Speer's team members would come to me and ask questions because Speer wasn't there or they could not locate him. There were occasions when the dispatcher could not locate Speer and the dispatcher would "get ahold of me." This was a common occurrence. The unavailability of Speer put a burden on me and my team members. My team members complained to me about the problems they had in covering for Speer's team. Speer's team members came to me for advice. Speer's team was more or less run by themselves without Speer being there. During his work shift, Speer left Joplin to go to Carl Junction.

Don Moser testified: During the summer of 1989 I was the midnight dispatcher. From time to time I had difficulty reaching Speer, who was the sergeant of the night shift. Other officers attempted to call Speer and got no response and would ask me to call him. I had difficulty reaching Speer about 40 percent of the time. There were times when Speer was not there. Speer would take time off and I wouldn't know he was gone. Speer was "just gone probably three or four days of the week." In the summer time the work load is increased 100 percent and you need a supervisor. Sometimes Speer would repeatedly "take off" at 2 a.m. and Cpl. Simmons would be left in charge. In my 23 years as a dispatcher, I have never had a sergeant who repeatedly took off without telling me like Speer did. No sergeant was as hard to get hold of as Speer.

Paul Corley testified with respect to the investigation of Speer, the notice given Speer on September 1, 1989, and the fact-finding hearing of September 18, 1989. Corley testified that on October 13, 1989, he recommended to the city manager that Speer be discharged for reasons which included the conduct charged in the five counts on which the Board later made findings of guilt. On cross-examination by Speer's counsel, Corley stated that there were earlier disciplinary problems with Speer. Those problems included drinking while in uniform, reporting to work late, and leaving work early.

Dale Owen testified: I made an investigation of Speer in the summer of 1989. I interviewed numerous employees and took statements. City's Exhibit 1 contains accurate transcriptions of those statements. On August 8, 1989, Speer signed the shift log showing that he signed in at 21:30 hours, but he did not arrive at the police department until 22:41 hours. On August 12, 1989, Cpl. Simmons notified me at 1:35 a.m. that Speer had left. I drove directly to Speer's home and at 2:04 a.m. both of Speer's personal vehicles were parked in front of his residence. Speer was not due to get off duty until 7:30 a.m., and he was not on duty. Speer's log for that date did not show the early departure.

Brian Simmons testified: On July 21, 1989, I wrote to Lt. McCracken and requested an official investigation of Speer. Speer would take time off when not authorized. Speer was not interested in working out schedules for the teams. Numerous times Speer would not be available to the team or answer his radio. Speer was hard to get hold of. There was no supervision of Speer's shift at all. On June 28, 1989, Speer and I observed Sgt. Sitton typing out a complaint on another officer. After Sitton left, Speer sat down on the floor in front of Lt. McCracken's office door and fished out the document, using a ruler. Speer asked me, "Is this wrong," and I said, "Don, I'd call it burglary." Speer pulled the document out, read it over, said it was a write-up on one of the dispatchers, and put it back under the door.

On cross-examination, Simmons testified that Speer's inefficiency, tardiness and conduct were "basically a standard joke. I would be met at the door by officers that would say, 'Well, did your boss make it here tonight.' It was common knowledge among the patrol level that this was occurring." Simmons also testified to a conversation he had with Speer. "I said, 'The guys are complaining that they can't get hold of you or anything,' and he said, 'I don't see there's a problem. You guys don't know how good you've got it,' and walked out on me."

David McCracken testified: I supervised Speer until he was terminated. Speer did not maintain control of his shift. Speer did not have knowledge of the goings-on of the shift. Speer failed to report for duty properly and left early. I supervised six sergeants and six teams, one sergeant per team. Speer's performance was not up to standard and was substantially less than the other sergeants. After Cpl. Simmons complained to me of Speer's work habits, I told Simmons to maintain a log. On at least three or four occasions, I made independent verifications of Speer's going home early or coming in late. On August 8, 1989, Speer came to work an hour and 12 minutes late, and his time sheet entry was wrong. On August 9, 1989, Speer was an hour and 15 minutes late. On August 10, 1989, Speer went home at 4 a.m. without filling out a sick leave sheet. I do not want Speer back on my team. There is no way I could trust him to do the job. As a sergeant, he is in control of the police department during his midnight shift. He's the same thing as the chief of police and has to make decisions that need to be made at that time.

McCracken also testified: If supervisors have confidential information, they put it under my door for privacy. I always lock my door. I am the only one who has access to it.

On cross-examination, McCracken testified that Speer went to Carthage while on duty without notifying McCracken, as his supervisor, that he was leaving town.

Michael Wightman testified: The investigation of Speer was handled by Lt. McCracken. Speer had the opportunity to state his side of the case at the fact-finding hearing. Officers on Speer's team complained that Speer was not present to put his team on the street. I did not direct the investigation, but I reviewed the results. There is no regulation that it is a violation to remove documents from under Lt. McCracken's door.[1] Common sense tells you that if a door is locked, the lights are off, and there is something underneath the door, you are not entitled to look at it. Speer failed to notify his supervisor when he went to Carl Junction and Carthage, and during one of those absences a crisis arose which required his attention. I consider all of these charges to be serious enough for total termination.

Max Baker testified that on November 10, 1989, he delivered the termination notice to Speer and his attorney. He said that under the City Charter, introduced into evidence, only the city manager could terminate an employee.

City Manager Leonard Martin testified that the notice of termination was given to Speer after the fact-finding hearing of September 18 had been conducted. "I did not participate in the fact-finding hearings. I participated in drafting the termination notice."

Gary Massa, a defense witness, testified: During the summer of 1989 I was a member of Speer's team. I had difficulty locating Speer. Speer was late at times. Speer took a lot of time off that he did not have coming. Cpl. Simmons supervised the shift 75 percent of the time. Because of Speer leaving the shift early, the shift was extremely short numerous times. Our team

1. Section 151 of the Joplin Police Department Rules & Regulations reads:
    CONFIDENTIAL INFORMATION
    Employees of the Department shall treat as confidential the official business of the Department. They shall not impart same to anyone except those for whom it is intended, or as directed by their ranking employee, or under due process of law.

did not have the respect of the other officers.

J.D. Love, a defense witness, testified: I served with Speer in the summer of 1989. At least twice a week Speer would go home early without completing his shift.

Annette Williams, a defense witness, testified that she was the hostess of the party mentioned by Opal Roberts and that alcoholic beverages were served there.

Kevin Sanders, a defense witness, testified that Speer went to Carl Junction while on duty.

Under questioning by his attorney, Speer testified that on prior occasions he had been disciplined about whether he had lost a radio, for drinking beer while on duty, for lack of punctuality, and for failure to obey a subpoena. He admitted removing the confidential material from under Lt. McCracken's door and that he had never known of anyone else doing so. He admitted going to Carl Junction and to Carthage while on duty.

Lt. Dale Owen, in addition to providing testimony earlier described, testified at length concerning the conduct which was the subject of each of the counts and cited specific rules and regulations of the City of Joplin Police Department which proscribed the conduct.

The foregoing partial summary of the testimony of the witnesses who appeared before the Board supports the Board's findings of guilty on five of the eight counts.

■ Speer argues that the Board improperly received into evidence exhibits, including unsigned statements, which constituted hearsay. As the excellent brief of the City points out, of the 13 statements introduced into evidence, 10 were statements of witnesses who testified at the Board hearing. The live testimony was sufficient to sustain the Board's findings, and the statements of the three unproduced witnesses concern matters which were either irrelevant to the Board's findings or were otherwise supported by live testimony.

This case differs from *Downs v. Personnel Advisory Board*, 671 S.W.2d 12 (Mo.

App.1984), relied upon by appellant. In *Downs*, the *only* evidence to support a required finding was hearsay, and, accordingly, insufficient. Here the hearsay was merely cumulative to the live testimony. See *McCallister v. Priest*, 422 S.W.2d 650, 659[14] (Mo.banc 1968); *Bell v. Bd. of Educ. of City of St. Louis*, 711 S.W.2d 950, 956[12,13] (Mo.App.1986).

Speer's first point challenges the evidentiary support for the Board's findings of guilty on five counts. This court holds the evidence was sufficient to support those findings. It is Speer's first point, rather than the Board's findings, which lacks factual support, and it has no merit.

Speer's second point is that the Board erred in upholding his termination because the city manager's dismissal was based on eight counts and the Board found Speer guilty on only five counts, and "because the Board was required to determine whether termination was an appropriate disciplinary measure based on the violations which the Board found."

Speer argues: "Where an individual is dismissed because of multiple allegations of misconduct and the Board fails to find that all of those allegations are sustainable, how can the Board ever know what the appointing authority would have done based upon the fewer violations? It cannot."

Speer cites no authority holding that such knowledge is necessary. The City cites *Curry v. St. Louis County*, 773 S.W.2d 499 (Mo.App.1989), where the Board properly upheld a dismissal of a police officer, although the Board found the officer guilty of fewer offenses than did the superintendent who had previously dismissed him.

■ Section 5.11 of the Home Rule Charter of the City of Joplin deals with dismissal, demotion in rank, suspension, and the laying-off of regular employees, and provides for an appeal by the employee to the Board. Section 5.11 reads, in pertinent part: "The personnel board shall affirm the action of dismissal, demotion, suspension or lay off or shall order the reinstate-

ment of the employee or restore him to his former rank or compensation...."

Here, the action of the city manager was that of dismissal. That action was affirmed by the Board. In so doing, the Board acted within the authority of § 5.11. In this respect, this case differs from *Stovall v. Civil Service Com'n*, 636 S.W.2d 364 (Mo.App.1982), the only authority cited by Speer in support of his second point. In *Stovall*, the Civil Service Commission for the City of St. Louis exceeded its authority by imposing a disciplinary action not authorized by its Rules or by the City Charter. That is not the situation here.

The violations which the Board found are set forth in the discussion of Speer's first point. The Board found that those violations "substantiate the City's reason for discharge under the City of Joplin Personnel Rules and Regulations in effect both prior to and after October 1989, and the City of Joplin Police Department Rules and Regulations." Speer has not challenged that finding.

This court holds that the Board, in finding Speer's guilt on the five counts justified his termination, did not act arbitrarily, capriciously or unreasonably, nor did it abuse its discretion. The Board's decision was not clearly contrary to the overwhelming weight of the evidence. See the language in *Gamble v. Hoffman, supra,* set forth in the fourth paragraph of this opinion. Speer's second point has no merit.

Speer's third point is that the Board erred in upholding the dismissal "because the City failed to follow its own rules and regulations which require that progressive discipline be administered to an employee prior to termination in that (a) the City determined at the outset that the only discipline it would consider was Speer's termination; and (b) the violations which the Board found Speer had committed would not warrant the use of termination as a disciplinary measure." This court rejects prong (b) for the reasons set forth in the discussion of Speer's second point.

In support of his third point, Speer argues that "neither Lt. McCracken, Chief Wightman, nor anyone else in a superviso-ry capacity made any attempt to bring about improvements in appellant's conduct." He also argues, "The overriding philosophy behind progressive discipline is that no employee should be dismissed without fair warning and an opportunity to improve."

Section 8.6 of the Personnel Rules and Regulations of the City of Joplin deals with disciplinary action for "violation of work rules, instances of unacceptable behavior, misconduct, or continued unsatisfactory performance." It states, in part: "Our approach to correcting unacceptable behavior or misconduct will normally consist of the following actions: ..." The actions listed are oral reprimand, written reprimand, disciplinary suspension, and dismissal. These actions are referred to as "progressive discipline."

As the City's brief points out, § 8.6 does not mandate the use of progressive discipline in all cases. In addition to language previously quoted, § 8.6 states:

> [T]he City reserves the right to deviate from the following schedule of counseling whenever it is necessary or advisable to do so. The City will make every reasonable effort to ensure that employees are treated in a fair and uniform manner, but it must reserve the right to treat each individual situation in light of the unique circumstances present whenever there is a work rule violation or other unacceptable behavior. *Obviously, some types of misconduct are so intolerable or objectionable that an employee must be dismissed, even for a first offense.*

> . . . . .

> Dismissal–Step 4: This is a last resort action for employees who fail to improve their conduct or performance after imposition of progressive disciplinary actions previously taken *or for single serious unacceptable conduct or behaviors.* (Emphasis added.)

Among the violations found by the Board were Speer's habitual tardiness for his shift and his habitually leaving early without proper authority. Section 8.5 of the

Personnel Rules and Regulations of the City reads, in pertinent part:

The City has a responsibility to provide continued and uninterrupted service to the citizens of Joplin. This responsibility can only be fulfilled when each employee is present during the work hours scheduled. Punctuality and regular attendance are essential to the proper functions of the City as a whole....

Excessive absenteeism, tardiness or refusal to comply with the proper notification procedures will be documented and considered as grounds for disciplinary action. 'Excessive absenteeism' is defined as six (6) different occasions in a twelve (12) month period. 'Excessive tardiness' is defined as ten (10) different occasions in a twelve (12) month period. However, a combination of absenteeism and tardiness of a persistent pattern may also be excessive....

When an employee is absent or tardy without proper notice, supervisors will follow normal counseling and correcting techniques, including the disciplinary steps (1–3) described in subsection 8.6. If the correcting techniques do not re-solve the notification problem *or the absences and/or tardiness become excessive or occur in a persistent pattern termination of employment may be authorized.* (Emphasis added.)

The record supports the following statements contained in the City's counter-argument to Speer's third point:

[T]he City of Joplin leaned over backwards to meticulously follow all of its rules and regulations. These efforts included Lieutenant McCracken's early refusal to act upon the uncorroborated accusations of Corporal Brian Simmons; the investigation of the 43–page counter-accusations lodged by Speer at his fact-finding hearing; the detailed analysis presented by the outgoing Personnel Director, Paul Corley, which discounted some charges originally brought against Speer; the burden of the City of Joplin in demonstrating violations not only of the Personnel Rules and Regulations in effect at the time of the conduct complained of from June through August, 1989, but also, of proving that that same conduct violated Joplin Personnel Rules and Regulations adopted in October of 1989 before the final termination of Speer in November of 1989; and the three day hearing before the Personnel Board for the City of Joplin which found for the City on some counts and against the City on others.

... Speer was the senior officer on duty during the night shift and for 2-½ months that the City knows about, and allegedly for some period prior thereto, Speer set his own hours, came and went as he pleased, covered up his conduct as best he could, and explained away what he could not cover up with an undocumented and uncorroborated allegation of counter surveillance and mistrust of the entire command staff of the Joplin Police Department.

Speer's service for the Joplin Police Department commenced in 1976, and, except for a three-year period, continued until his termination in 1989. He achieved the rank of sergeant in 1985. He was the holder of a Bachelor's Degree in Criminal Justice Administration. He had attended over 30 professional courses in police work. The Board could reasonably have concluded that his background would make him aware that quitting the midnight shift, of which he was the head, before he was entitled to do so, failing to supervise properly his team, leaving the city without knowledge or permission of his supervisor, obtaining confidential information not meant for his inspection, and drinking in public while in uniform, were, at least in their totality, "misconduct ... so intolerable or objectionable that an employee must be dismissed, even for a first offense." Section 8.6, supra.

This court holds that the Board properly could have found, as it did by implication, that § 8.6 did not mandate progressive discipline in the "unique circumstances" of this case. Speer's third point has no merit.

Sgt. Speer had a fair, full and complete hearing before the Board without procedural error. The findings of the Board are

supported by competent and substantial evidence on the whole record. The Board's decision is not contrary to the weight of the evidence. The circuit court properly denied the petition for review and affirmed the decision of the Board.

The judgment is affirmed.

MONTGOMERY, P.J., and MAUS, J., concur.